### A09A2212. WATSON v. THE STATE.
#### (691 SE2d 378)

ADAMS, Judge.

A jury convicted Jefferson Watson on one count each of child molestation (OCGA § 16-6-4 (a)), aggravated child molestation (OCGA § 16-6-4 (c)), and distribution of cocaine (OCGA § 16-13-30). On appeal, he asserts that the trial court erred in denying his motion to suppress evidence seized from his home and further that the evidence was insufficient to support his convictions.

On March 1, 2008, Deputy Jason Barber of the Tift County Sheriff's Department was searching for N. M., a 15-year-old runaway girl. N. M.'s mother told the deputy that N. M. might be with Watson[1] and directed the officers to the trailer park where Watson lived. Barber and two other officers went to Watson's mobile home, where they saw two pickup trucks parked outside. While one officer made "numerous attempts . . . to get someone to answer the front door" without success, Barber and another officer went to the back door. The trailers were lined up in a row, and no fence or other obstacle blocked the officer's path to the back door. After about four to five minutes of knocking on the back door with no response, Barber tried the doorknob and the door opened outward. Barber announced through the open door that he was a deputy with the Tift County Sheriff's Office and called three times for somebody to come to the

---

[4] Because we reverse the forfeiture on this ground, we need not address Williams' remaining enumerations of error.

[1] Watson was in his mid-forties at the time.

back door. He did not enter the trailer. When Barber heard no response or movement, he called, "If nobody comes to the back door, I'm coming inside the house to check." Barber then heard someone moving around inside the trailer, and "almost immediately," Watson met him at the back door. He was wearing pajama bottoms and was wrapped in a blanket. Barber still had not entered the mobile home at this point.

Barber told Watson that he was looking for N. M., who had run away from home. Watson replied that he had not seen N. M., that she was not there and that she had not been to his house. Barber then asked for permission to come into the house to look for the girl, and Watson agreed. Shortly after Barber entered the house, he again asked Watson if N. M. was there, and this time Watson admitted that she was in the trailer, although he did not know exactly where she was. Watson called out N. M.'s name as they approached his bedroom, and Watson indicated that N. M. was in the closet. When Barber opened the door, he found N. M., unclothed, inside. Police took N. M. into custody and placed Watson under arrest for contributing to the delinquency of a minor.

Cliff Henderson, an investigator with the Tift County Sheriff's Office, interviewed N. M. the same day. She initially told the investigator that she did not have sex with Watson. Henderson let N. M. leave with her father, but after a few minutes her father brought her back and said his daughter had more information to tell Henderson. N. M. stated in the second interview that she had smoked crack cocaine with Watson and they had sex in his bed. She told investigators that he had used a pink condom, which he threw into a waste basket in the kitchen.

Henderson then secured a search warrant for Watson's mobile home. During the search, officers found a pink-colored condom in the kitchen waste basket. In the bedroom, he found a condom wrapper on the dresser next to the bed and a glass pipe of what appeared to be crack cocaine in the bathroom. The glass pipe subsequently tested positive for cocaine in tests run by the state crime lab. A blood sample taken from N. M. also tested positive for cocaine and benzoylecgonine, a primary metabolite of cocaine.

Additionally, Henderson obtained DNA samples from both Watson and N. M., and a rape kit was done on N. M. at a local hospital. Testing by the state crime lab indicated the presence of Watson's DNA in N. M.'s vagina. DNA from both Watson and N. M. was also found on the pink condom.

During a March 5, 2008 interview at a child advocacy center, N. M. stated that she had met Watson four to five months earlier, that he had given her Xanax or Vicodin and that he had sex with her. On other occasions, Watson and she smoked crack cocaine supplied

YALE LAW LIBRARY

by him. She said that Watson had sex with her more than five times, but less than ten. During those encounters, Watson put his mouth on her vagina almost every time and she put her mouth on his penis at least two times. She also said that Watson had anal intercourse with her, but he stopped when she told him that it hurt.

N. M. testified at trial that she first met Watson when she went to his house to buy marijuana. She went back the next night and Watson gave her Xanax or Vicodin and afterward they had sexual intercourse. Later, she returned to his trailer where he gave her crack cocaine, which she had never smoked before. Afterward, they had sex. On March 1, 2008, N. M. walked to Watson's house. He was not home, so she waited about 15 minutes for him to arrive. They later smoked crack and had sex. Watson used a red condom, which he threw in the kitchen trash. The police came later that morning and found her in the closet without her clothes on. She also testified that there was one occasion when Watson put his penis in her anus, but took it out when she told him it hurt.

1. Watson argues that the trial court erred in denying his motion to suppress.[2] On appeal from the grant or denial of a motion to suppress,

> the trial court's application of the law to the facts is subject to de novo review if the facts are stipulated, or if the critical facts do not depend on the testimony of witnesses who are subject to cross-examination. However, a trial court's ruling on a motion to suppress frequently involves a mixed question of fact and law. When the outcome of a motion to suppress depends on the credibility of the witnesses or on disputed facts, and the trial court has not committed an error of law, the court's ruling will not be disturbed on appeal.

(Citation omitted.) *Slayton v. State*, 281 Ga. App. 650, 650-651 (1) (637 SE2d 67) (2006). See also *State v. Sanders*, 274 Ga. App. 393, 394 (617 SE2d 633) (2005).

Barber and the other officers went to Watson's house in pursuit of a runaway juvenile because the girl's mother "felt like" her daughter might be with Watson. When they arrived, they saw two trucks parked in front, suggesting that someone might be home, so they approached the trailer and began knocking on the doors. "The fourth amendment proscribes unreasonable searches and seizures. When police respond to requests to locate missing persons by

---

[2] The trial judge ruled from the bench on Watson's motion to suppress and gave no basis for his decision.

entering private property only to the extent of knocking on outer doors, the fourth amendment has not been violated." *Gilreath v. State*, 247 Ga. 814, 819 (1) (279 SE2d 650) (1981). See also *Xiong v. State*, 295 Ga. App. 697 (1) (673 SE2d 86) (2009); *King v. State*, 289 Ga. App. 461, 464-465 (2) (657 SE2d 570) (2008). The officers' actions up to that point, therefore, were part of "a permissible knock-and-talk procedure. [Cit.]" *Herring v. State*, 279 Ga. App. 162, 164 (630 SE2d 776) (2006).

Watson argues, however, that Barber went beyond this permissible procedure when he opened the door to the mobile home, and the State cites no authority indicating that Barber had the right to do so. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" (Citation and punctuation omitted.) *Brown v. State*, 261 Ga. App. 351, 354 (1) (582 SE2d 516) (2003). See also *Welchel v. State*, 255 Ga. App. 556, 558 (565 SE2d 870) (2002). "As a rule to justify a nonconsensual, warrantless intrusion into a person's home, there must exist probable cause for the arrest or search inside the home and a showing of exigent circumstances." (Citations and punctuation omitted.) *Johnson v. State*, 300 Ga. App. 605, 606-607 (685 SE2d 339) (2009). "An exigent circumstance justifying the warrantless entry of a private residence is the officer's reasonable belief that such action is a necessary response on his part to an emergency situation." (Punctuation and footnote omitted.) *State v. Culpepper*, 295 Ga. App. 525, 527 (672 SE2d 494) (2009).

While it is understandable that the police were concerned about N. M.'s welfare, they had no probable cause to believe that she was in Watson's trailer and no evidence of any exigent circumstances to support a warrantless search. When Barber opened the back door, the officers had only the mother's suspicion that N. M. might be with Watson, and the only indication that someone might even be inside the trailer were the two trucks parked outside. Further, Barber did not testify that he believed he was responding to an emergency. The police heard no sound at all in response to their knocking, and the record contains no evidence that would have led the police to believe that even if N. M. was with Watson, she was in any kind of danger. Accordingly, the police had no authority to open Watson's door. See *State v. Culpepper*, 295 Ga. App. at 527. *State v. Gallup*, 236 Ga. App. 321, 324 (2) (512 SE2d 66) (1999). Compare *Clark v. State*, 302 Ga. App. 156, 159 (3) (690 SE2d 466) (2010) (police properly pushed open ajar access door and looked into crawlspace, where, inter alia, witnesses saw defendant drag victim out of car by hair toward trailer); *Coker v. State*, 164 Ga. App. 493, 496 (5) (297 SE2d 68) (1982) (no Fourth Amendment violation where police, who had probable cause to believe defendant had taken 13-year-old girl from

school premises without father's consent and a reasonable belief that he had taken the child to his house, entered defendant's house out of concern for child's safety).

The State asserts, however, that any illegal police action was "mooted" when Watson gave consent for police to search his trailer. But Watson counters that his consent to search was not voluntary because he gave it only after Barber said he would come into the trailer. We agree.

"To justify a warrantless search on the grounds of consent, the State must prove the consent was voluntary under the totality of the circumstances." (Citations omitted.) *Pledger v. State*, 257 Ga. App. 794, 796-797 (572 SE2d 348) (2002). See also *Brooks v. State*, 285 Ga. 424, 426 (677 SE2d 68) (2009). And where, as here, the consent followed an illegal entry into the defendant's home,

> we examine the totality of the circumstances to determine whether the consent was voluntary because it was obtained by means sufficiently attenuated or distinguishable from the illegality to be purged of any taint, or whether the consent was invalid because it was the product of and tainted by the illegality.

(Citations omitted.) *Snider v. State*, 292 Ga. App. 180, 183 (663 SE2d 805) (2008). See also *Pledger v. State*, 257 Ga. App. at 797. "In making this determination, proof of voluntary consent alone is not sufficient. The relevant factors to be considered include the temporal proximity to the illegal entry, the intervening circumstances and the purpose and the flagrancy of the official misconduct." (Citation omitted.) *State v. Brown*, 269 Ga. App. 875, 877 (605 SE2d 628) (2004).

After opening the door and calling several times for someone to come to the door, Barber called out that he was coming inside if no one came. This statement implied that the police had the authority to enter Watson's trailer, when in fact they did not. Watson appeared almost immediately in response to this statement, after ignoring the officers' repeated knocking and requests for someone to answer. Barber explained why the police were there and briefly questioned Watson before asking for permission to search.

It is apparent under any construction of these facts that Watson's consent was not sufficiently attenuated from Barber's illegal entry and misrepresentation of authority, but instead was an immediate response to it. Thus the consent was "merely a submission to an apparent legitimate display of legal authority to which all are required to submit" and therefore not voluntary. (Citation and punctuation omitted.) *State v. Fulghum*, 261 Ga. App. 594, 596 (2) (583 SE2d 278)

(2003). See also *Snider v. State*, 292 Ga. App. at 183; *State v. Jones*, 269 Ga. App. 325, 327 (604 SE2d 228) (2004). Accordingly, the trial court should have granted Watson's motion to suppress to the extent that it sought to exclude evidence obtained during the warrantless entry and search of Watson's home. See *Threatt v. State*, 240 Ga. App. 592, 596-597 (1) (524 SE2d 276) (1999). The inadmissible evidence, therefore, includes the discovery of N. M. hiding in Watson's closet, and Watson argues that her subsequent statements, as well as the evidence obtained from the ensuing search warrant, are also "fruit of the poisonous tree" under the exclusionary rule. We disagree.

The rationale behind the exclusionary rule is to prevent the State from capitalizing on police misconduct to put the prosecution in a better position than it would have been if no illegality had occurred. *Teal v. State*, 282 Ga. 319, 323 (2) (647 SE2d 15) (2007). "At the same time, the prosecution is not to be put in a *worse* position simply because of some earlier police error or misconduct." (Citation and punctuation omitted; emphasis in original.) *Vergara v. State*, 283 Ga. 175, 184 (2) (657 SE2d 863) (2008).[3] Accordingly, the Courts have recognized two exceptions to the rule: (1) the independent source doctrine and (2) the inevitable discovery doctrine:

> The independent source doctrine allows admission of evidence that was discovered by means wholly independent of any constitutional violation, while the ultimate or inevitable discovery doctrine allows admission of evidence that was discovered as a result of police error or misconduct if the State establishes by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means, without reference to the police error or misconduct.

(Citation omitted.) *Teal v. State*, 282 Ga. at 323-324 (2). These exceptions seek to determine whether the evidence in question "has been come at by exploitation of [the] illegality or instead by means sufficiently distinguishable to be purged of the primary taint."[4]

---

[3] "Evidence suppressed because of an illegal search does not become 'sacred and inaccessible.'" (Citation omitted.) *Pasha v. State*, 273 Ga. App. 788, 791 (2) (616 SE2d 135) (2005).

[4] While both exceptions depend upon this basic analysis, they are in fact distinct: When properly applied, the "independent source" exception allows the prosecution to use evidence only if it was, in fact, obtained by fully lawful means. The "inevitable discovery" exception differs in one key respect: specifically, the evidence sought to be introduced at trial has not actually been obtained from an independent source, but rather would have been discovered as a matter of course if independent investigations were allowed to proceed. (Citation and punctuation omitted.) *Teal v. State*, 282 Ga. at 324 (2).

YALE LAW LIBRARY

(Citation and punctuation omitted.) Id. at 323 (2). So "even if evidence would not have been discovered but for the illegal police conduct, if the derivative evidence has only an attenuated link to the illegality, it need not be suppressed." (Citation and punctuation omitted.) *Adkins v. State*, 298 Ga. App. 229, 231-232 (679 SE2d 793) (2009). "In making this determination, we consider the temporal proximity of an illegal seizure and consent, intervening circumstances, and the purpose and flagrancy of the official misconduct." (Citation and punctuation omitted.) Id. at 232.

Applying these factors, we find that N. M.'s second statement to police and the evidence obtained pursuant to the subsequent warrant were admissible under the independent source doctrine. Although N. M. originally was taken into custody as a result of the illegal search, she was initially questioned and released by police. She said nothing in the first interview to implicate Watson in the crimes at issue. It was only in her second interview, after she left with her father, that she made the statements upon which the warrant was based. While this interview occurred only a short time after the first, it was further separated in time from the illegal search and came only after the intervening circumstance of her release from police custody. We conclude, therefore, that N. M.'s second statement had only an attenuated link to the earlier illegality and came from an independent, lawful source. See *Stidham v. State*, 299 Ga. App. 858, 864 (1) (683 SE2d 906) (2009); *Padgett v. State*, 287 Ga. App. 789, 791 (1) (653 SE2d 102) (2007); *Threatt v. State*, 240 Ga. App. at 596-597 (1).

The evidence also would be admissible under the inevitable discovery doctrine. To establish that exception, the record must show a reasonable probability that police would have discovered the evidence by lawful means and they must have possessed and been actively pursuing these lawful means prior to the occurrence of the illegal conduct. *Teal v. State*, 282 Ga. at 325 (2). Here, the police were actively searching for N. M. as a part of a legal investigation of a reported runaway and knew that her mother had reason to believe that she was spending time with Watson. Even if they had discovered N. M. somewhere else, they would have been entitled to question her as to her whereabouts and interactions with Watson based upon their prior knowledge. So while the evidence that police discovered N. M. in Watson's trailer should have been suppressed, a reasonable probability exists that anything she said about her whereabouts or her dealings with Watson would have ultimately been discovered during the police's legal investigation of a reported runaway. See *Hyde v. State*, 275 Ga. 693 (572 SE2d 562) (2002) (discovery of

witness at murder trial inevitable as part of lawful investigation into the murder, even though document identifying witness suppressed); *State v. Andersen*, 232 Neb. 187, 200 (440 NW2d 203) (1989) (allowing testimony of sexual abuse victims under inevitable discovery doctrine, even though address book identifying victims suppressed, where evidence indicated that boys would otherwise have been discovered during legal child pornography investigation).

Accordingly, we find that the trial court properly denied Watson's motion to suppress as it related to N. M.'s second statement to police and the evidence obtained under the warrant authorizing the second search of Watson's home.[5]

2. Watson also argues without elaboration that the evidence at trial was insufficient to support his convictions. We disagree. N. M.'s testimony, her earlier statement to the child advocate, the evidence seized during the second search of Watson's home, and the crime lab analyses are more than sufficient to authorize the jury to find Watson guilty beyond a reasonable doubt.[6]

*Judgment affirmed in part and reversed in part. Blackburn, P. J., and Doyle, J., concur.*

DECIDED MARCH 4, 2010.

*Ronald L. Beckstrom*, for appellant.
*C. Paul Bowden, District Attorney*, for appellee.

---

[5] Although the affidavit supporting the warrant recites evidence from both the illegal search and N. M.'s lawful statement, "the untainted information, considered by itself, establishes probable cause for the warrant to issue" and thus any evidence obtained through the warrant was admissible. (Citations and punctuation omitted.) *Rothfuss v. State*, 160 Ga. App. 863, 864 (1) (288 SE2d 579) (1982). See also *Bius v. State*, 254 Ga. App. 634, 638 (4) (563 SE2d 527) (2002).

[6] Although the trial court erred in admitting testimony and evidence in connection with the illegal entry and search of Watson's home, any such error was harmless beyond a reasonable doubt in light of the overwhelming admissible evidence at trial. See *White v. State*, 258 Ga. App. 546, 548 (2) (574 SE2d 629) (2002); *Nealey v. State*, 233 Ga. 326, 327 (211 SE2d 286) (1974).