**FOURTH DIVISION**
**DOYLE, P. J.,**
**MCFADDEN and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 18, 2013**

# In the Court of Appeals of Georgia

A13A1078. ANSLEY v. THE STATE.
A13A1079. JOHNSON v. THE STATE.
A13A1303. HANNAH v. THE STATE.

BOGGS, Judge.

Randy Ansley, Brian Lamar Johnson, and Quincy Hannah were tried together and convicted of armed robbery. Their amended motions for new trial were denied, and they appeal, asserting various enumerations of error. Finding no error, we affirm.

All three appellants contend the trial court erred in denying their motions to suppress documentary and testimonial evidence. "When reviewing a trial court's ruling on a motion to suppress, we apply the 'any evidence' standard, which means that we sustain all of the trial court's findings of fact that are supported by any evidence. We construe all evidence presented in favor of the trial court's findings and judgment." (Citation, punctuation, and footnote omitted.) *Davis v. State*, 302 Ga.

App. 144, 144-145 (690 SE2d 464) (2010). Because the defendants "intensely cross-examined the officer[s] and challenged [their] credibility" in multiple hearings on the motions to suppress, and at trial, we "do not apply a de novo standard of review, which applies only where the facts are undisputed." (Citation and footnote omitted.) Id. at 145. In reviewing the trial court's rulings, we may look at trial testimony as well as testimony at the hearing on the motion to suppress. *Jones v. State*, 318 Ga. App. 614, 616 (2) (734 SE2d 450) (2012).

So construed, the evidence showed that a finance company in Monroe, Georgia was robbed on December 4, 2009, shortly before 1:00 p.m. The manager of the company testified that the third day of the month was the company's busiest day, because social security, retirement and VA checks were received by their customers, who then made payments owed to the company. She further testified that the employees customarily collected all the receipts and secured them in her desk for deposit with the bank. On December 4, the company had approximately $600 as "normal operating cash" and just over $5,200 to deposit with the bank.

The robber arrived while the sole male employee of the business was on his regular lunch break from 12 noon to 1 p.m. The robber entered the business through an open back door, which was ordinarily kept locked and barricaded with a two-by-

2

four board, chain, and padlock during business hours. Employee Cassandra Cameron was the last person to open the door before the robbery; she had asked to borrow the manager's keys that morning to take out the trash, although trash was not ordinarily taken out until mid or late afternoon, which was the slowest time in the office.

After entering the business by the back door, the robber put a gun to the manager's head and demanded, "Get the money." He took the manager's cell phone and instructed Cameron to get the money; the manager told Cameron to obey the robber, and she unlocked the manager's desk drawer and put the money in a bag. The manager described the robber as a black male with dark eyes and a "very well groomed" goatee and mustache, wearing a black Carhartt-style heavy jacket with a grey hoodie underneath, khaki pants, white tennis shoes and a black ski mask. The manager also testified that Cameron was unnaturally calm during the robbery and ignored the robber's instructions to remain in the bathroom for ten minutes after he left. The male employee returned about five minutes before 1:00 p.m. and chased the robber out the back door; he caught a glimpse of "dark clothes, white shoes." After the robbery, the deposit bag was discovered lying on the floor near the manager's desk "as if someone had dropped it."

3

At about 1:00 p.m., a Monroe police officer on patrol noticed Johnson, whom he knew from prior law enforcement contact, walking down the street behind the finance company. Johnson, whose photograph depicts a black male with a neatly-trimmed goatee beard and mustache, was wearing khaki pants and a dark-colored jacket, and it appeared to the officer that Johnson was trying to avoid him. A few minutes later, the officer learned that the finance company had been robbed and received the description of the suspect. He immediately returned to the area but was unable to relocate Johnson. After obtaining a photograph of Johnson, he provided it to other officers and they all continued the search. Several hours later, Johnson was located and taken into custody; $300 in cash, a cell phone, and a cell phone charger were found on his person.

The City of Monroe police department is located less than a block from the scene of the robbery. The police arrived "very, very quickly" and began their investigation. A nearby resident reported seeing an older model "white BMW with light tinted windows" driving back and forth "four or five times" on his street at about 12:30 p.m. on the day of the robbery. The last time the vehicle went by, around 1:00 p.m., it was traveling at a high rate of speed "from downtown going towards Spring Street" and was occupied by two or three individuals. A sheriff's deputy took

information from the resident and instructed officers to be on the lookout for a "white BMW with small, gold rims."

Another sheriff's deputy in an unmarked vehicle received the BOLO and recalled that he had recently seen a similar vehicle in a subdivision about two miles from the robbery scene. He drove to the subdivision, and around 1:45 p.m., he saw a white BMW pull up to a residence; two black males, whom he recognized from "dealing with them" although he did not recall their names, went in the house. A few minutes later, the deputy saw the same men get into a different vehicle and leave, and he radioed that information to dispatch.[1] Other officers made a traffic stop on the second vehicle; Ansley was driving and Hannah was a passenger.

Both men were questioned and arrested, but the trial court later determined that the arrests were based upon insufficient probable cause and suppressed their statements given at the time of the arrest. The trial court held, however, that the vehicle stop itself was permissible based upon the specific and articulable facts known to the police.

---

[1]The owner of the residence testified that Ansley came to her home that day and asked to borrow her car because his foot was injured and he could not drive his straight shift car.

After police informed the manager of the finance company that Ansley had been arrested, she told police that she recognized his name. Ansley was the cousin of Roman, Cameron's live-in boyfriend and father of her child, and the manager had seen Ansley on several occasions when she gave Cameron a ride home. A police detective spoke with Cameron and her boyfriend that evening, and explained that he believed the robbery was committed by someone with "inside knowledge" who knew that there was a large amount of money on hand and that the only male employee would be out of the office. Both agreed that there had to be inside knowledge, and both agreed to come down to the police station for polygraph examinations. But when Cameron arrived for her polygraph, she instead gave a voluntary statement asserting that the robbery was planned by Ansley and Hannah in her apartment. Cameron pleaded guilty and testified at trial.

Four days after the arrest of Ansley and Hannah, a jail trusty, who was acquainted with both men, was asked by Hannah to deliver a letter to Ansley. The letter was intercepted by jail personnel; it was addressed to "White Boy" and instructed him in detail as to "your story." The letter added, "don't take no pleas all of us is taking to to [sic] trail [sic] if they don't drop it in less than 2 years nobody going to talk then we will be free." Ansley has "White Boy" tattooed on his arm;

6

Johnson's given name is Brian, and Hannah's letter repeatedly referred to "Bryant" and "Black" and instructed Ansley to say that he knew "Bryant" as "Black."

*Case No. A13A1078*

1. In his sole enumeration of error, Ansley contends that the trial court erred in denying his motion to suppress, for two reasons. First, he contends that the traffic stop of the vehicle he was driving was improper, relying almost exclusively upon *Vansant v. State*, 264 Ga. 319 (1) (443 SE2d 474) (1994). Second, he contends that Cameron's statement to police should have been suppressed as "fruit of the poisonous tree" because she knew that he had been arrested and this knowledge caused her to reveal his involvement in the robbery. Neither contention has merit.

(a) A "particularized description of a suspect vehicle may provide a reasonable suspicion sufficient to warrant a *Terry* stop." *Shorter v. State*, 239 Ga. App. 625, 626 (1) (521 SE2d 684) (1999). Here, police had a detailed description of the car including its make, color, approximate age, and features such as tinted windows and rims. A deputy was able to locate the car within 45 minutes after a BOLO was put out, at a location within two miles of the robbery that could be easily reached on main roads in the direction the vehicle was last seen traveling. This description "was much more particularized than that in *Vansant*." *Cray v. State*, 291 Ga. App. 609, 611-612

(1) (662 SE2d 365) (2008) (description including make, model, color, size, wheels; vehicle found and stopped 30 minutes after robbery). "Given the vehicle's description and proximity to the crime, the officer had a well-founded, objective basis for suspecting the occupant of the vehicle was the subject of the lookout." (Citations and punctuation omitted.) Id.

In addition, officers knew that the white BMW belonged to Ansley, went to the area where it was last seen, and had Ansley and his companion under observation when they switched cars – conduct that suggested an effort to throw off pursuit. See, e.g., *Watt v. State*, 317 Ga. App. 551, 554 (1) (732 SE2d 96) (2012) (plan to switch vehicles part of trafficking scheme). The trial court did not err in holding that the officers had sufficient specific and articulable suspicion to support a *Terry* stop. *Cray*, supra, 291 Ga. App. at 612.

(b) Ansley, citing only the venerable decision of *Wong Sun v. United States*, 371 U. S. 471 (83 SCt 407, 9 LE2d 441) (1963), contends that Cameron's statement to police should have been suppressed as "fruit of the poisonous tree," because Cameron knew that Ansley had been arrested and this caused her to reveal his involvement in the crime. But even assuming that this conjecture regarding Cameron's motivation is correct, "[t]he 'fruit of the poisonous tree' doctrine fails

8

where intervening circumstances attenuate the link between the illegality and the evidence obtained. [Cit.]" *Rashid v. State*, 292 Ga. 414, 419 (4) (737 SE2d 692) (2013).

> [W]hen examining the admissibility of evidence that is "fruit of the poisonous tree," the appropriate question is whether the evidence at issue has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. Using this rationale, two functionally similar exceptions to the exclusionary rule — the independent source doctrine and the ultimate or inevitable discovery doctrine — have developed because the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position than they would have been in if no police error or misconduct had occurred.

(Citations, punctuation, and footnote omitted; emphasis in original.) *Teal v. State*, 282 Ga. 319, 323 (2) (647 SE2d 15) (2007).

> The independent source doctrine allows admission of evidence that was discovered by means wholly independent of any constitutional violation, while the ultimate or inevitable discovery doctrine allows admission of evidence that was discovered as a result of police error or misconduct if the State establishes by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means, without reference to the police error or misconduct.

9

(Citation omitted.) Id. at 323-324 (2). "In making this determination, we consider the temporal proximity of an illegal seizure and consent, intervening circumstances, and the purpose and flagrancy of the official misconduct." (Citations and punctuation omitted.) *Watson v. State*, 302 Ga. App. 619, 624-625 (1) (691 SE2d 378) (2010). And on review by this court, "[t]he legal question is whether there is any evidence to support the judgment call made by the trial court. In the case at bar, the evidence was almost entirely testimonial. The judgment call thus depends largely on the trial court's evaluation of the witnesses' credibility and the weight to be assigned to their varying testimony." *Stidham v. State*, 299 Ga. App. 858, 864 (1) (683 SE2d 906) (2009).

Here, as noted above, the police had a specific and articulable suspicion to support the stop of the vehicle driven by Ansley, and, as the trial court correctly observed, his identification as a suspect was independent of his illegal arrest. Even had Ansley not been arrested after the legal traffic stop, he was identified as a suspect within an hour of the robbery, and the police would have continued their investigation of him regardless of whether he was in custody. It is at least as likely that Cameron could have been motivated to confess by the detective's informing her that the robbery involved inside information. But even assuming that Cameron was motivated by news of Ansley's arrest rather than the police investigation, there is no evidence

10

that Cameron's actions would have been different had she learned instead that Ansley had been stopped and questioned, or that he had been identified as a suspect. And the manager's report to police of Ansley's relationship with Cameron would not have changed, regardless of how she learned that Ansley was a person of interest to the police. Moreover, given the substantial facts suggesting that the robbery was an "inside job," there is a reasonable probability that the police in the ordinary course of their investigation would have uncovered the connection between Ansley and Cameron regardless of his arrest.

The trial court did not err in concluding that Cameron's statement is "untainted by any illegality associated with the arrest of the defendant and is therefore admissible." See *Watson*, supra, 302 Ga. App. at 625-626 (reasonable probability that witness' statements would have been discovered during ordinary course of police investigation, regardless of illegal search); *Stidham*, supra, 299 Ga. App. at 864 (1) ("In view of the multiple investigations which were ongoing contemporaneously . . . , we cannot say that there was no evidence to support the trial court's decision.")

In a single enumeration of error, Johnson contends that the trial court erred in denying his motion to suppress, and that the evidence therefore was insufficient to support his conviction.

2. (a) Johnson contends that the trial court erred in denying his motion to suppress because officers had no probable cause to arrest him. But an arrest "is constitutionally valid if, at the moment the arrest is made, the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the accused had committed or was committing an offense." (Citations and punctuation omitted.) *Flemister v. State*, 317 Ga. App. 749, 759 (4) (d) (732 SE2d 810) (2012).

Here, the victim gave a detailed description of the armed robber, including his clothing and beard, and the direction in which he fled from the building. Almost simultaneously with the commission of the crime, a police officer fortuitously encountered Johnson, whom he knew and recognized, on the street behind the building. Johnson appeared to the officer to be trying to avoid him, and the officer almost immediately learned that Johnson matched the description of the robber. The officer obtained a photograph of Johnson and provided it to other officers who

12

eventually located and arrested him; the photograph introduced in evidence by the State shows Johnson wearing a neatly-trimmed goatee beard and mustache, as described by the robbery victim.

In *Davis v. State*, 304 Ga. App. 355, 358 (1) (a) (696 SE2d 381) (2010), we found probable cause to arrest Davis when an eyewitness gave a detailed description of the shooter and his clothing and the direction in which he fled, and police shortly afterwards encountered Davis, who matched the description, near the scene. And though Johnson was arrested as a result of the information shared among several officers, "[p]robable cause can be based upon the collective knowledge of multiple police officers when there is some degree of communication between them." (Citation and punctuation omitted.) Id.

(b) The evidence presented at trial was sufficient to support Johnson's conviction under *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). *Garlington v. State*, 268 Ga. App. 264, 272 (6) (601 SE2d 793) (2004).

*Case No. A13A1303*

3. In his first enumeration of error, Hannah contends that the trial court erred in denying his motion to suppress the letter he attempted to send to Ansley. He argues that had he not been illegally arrested, he would never have written the note and the

13

police would not have seized it. For the reasons discussed in Division 1 (b), above, given the ongoing police investigation, Hannah's identification as a suspect within an hour of the robbery on December 4, and Cameron's positive identification on December 8 of Hannah as a participant in the robbery, we cannot say that the trial court erred in concluding that the connection between Hannah's arrest and the letter was sufficiently attenuated.[2]

4. In two enumerations of error, Hannah alleges ineffective assistance on the part of his trial counsel. "The two-prong test for determining the validity of a claim of ineffectiveness of counsel provided in *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984) asks whether counsel's performance was deficient and, if so, whether this deficiency prejudiced the defense; that is, whether there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's deficiency." (Citation and punctuation omitted.) *Bruce v.*

---

[2]Hannah puts great emphasis on the short period of time between Cameron's interview on December 8 and the discovery of the letter. But given the ongoing, intensive police investigation and the fact that Hannah was identified as a suspect within a few minutes of the robbery, there was sufficient probability that Hannah's arrest would have taken place by December 8 or even sooner, had the investigation proceeded without his initial arrest. Hannah's contention that he would not have been in jail on December 8 and would not have written the letter was resolved against him by the trial court.

14

*State*, 252 Ga. App. 494, 498 (2) (555 SE2d 819) (2001). And "[a] trial court's finding that a defendant has not been denied effective assistance of trial counsel will be affirmed unless clearly erroneous." (Citations and punctuation omitted.) *Scapin v. State*, 204 Ga. App. 725 (420 SE2d 385) (1992).

(a) Hannah first contends that his trial counsel was ineffective in failing to communicate a plea offer from the State. At sentencing, the prosecutor stated that Hannah had been offered a plea of twenty with ten years to serve for armed robbery. Hannah claimed he was never informed of any plea offer and that he would have accepted it, but "every time I asked [trial counsel] about a plea, he told me, they really ain't got no case, we going to win." Hannah's trial counsel, on the other hand, testified that the State made a plea offer in writing over a year before trial of 12 years to serve. According to trial counsel, at the pretrial conference in October, "the Judge said, has the state made you an offer, and I looked at [Hannah] and said, yes, it's 12 years to serve. And he said he didn't want it. I relayed to the Judge he did not want the offer." He also testified that Hannah told him "he did not want to be sentenced under armed robbery if he could avoid it" because of the mandatory minimum sentence.

15

Hannah contends that the inconsistency in the term of years mentioned by his trial counsel at the hearing on the motion for new trial and that stated by the prosecutor at sentencing, together with trial counsel's failure to correct the prosecutor when he told the judge that no plea offer was on the table, demand a finding of ineffective assistance.[3] We disagree.

The trial court noted correctly that the conflicting testimony presented a credibility issue. In resolving the conflict, the court expressly considered several factors: that Hannah acknowledged he was informed of the minimum and maximum sentences for armed robbery, that his counsel testified that he discussed a plea with Hannah "over and over," and that Hannah rejected the idea of any plea to armed robbery because he did not want to serve the mandatory ten years. The trial court also considered the letter written by Hannah from the jail instructing his co-defendant, "don't take no pleas," and concluded that Hannah "had no intention of accepting any plea offer and would not plead guilty regardless of any sentencing offer."

---

[3]Hannah points to a colloquy between the court and prosecutor at a status hearing on October 10, 2011, in which he claims "the State announced that there was no plea offer." But a review of the relevant transcript shows that the prosecutor, in response to the trial court's question as to whether an offer had been made, responded, "I cannot say if it has or hasn't, Your Honor."

"When considering claims of ineffectiveness of counsel, the trial judge determines witness credibility and is not required to accept the defendant's version of events. [Cits.]" *Matthews v. State*, 294 Ga. App. 836, 840-841 (3) (b) (670 SE2d 520) (2008). "Since determining the credibility of witnesses is a matter left to the trial court's discretion," we find that the trial court did not err in denying Hannah's motion for new trial based on alleged ineffective assistance of counsel in failing to communicate a plea offer. *Terrell v. State*, 276 Ga. App. 102, 104 (1) (622 SE2d 434) (2005) (when evidence in conflict, trial court did not abuse discretion in determining that defendant was informed of plea offer).

(b) Hannah asserts that his trial counsel rendered ineffective assistance generally "throughout trial," citing in an abbreviated fashion various instances of alleged ineffectiveness. Although Hannah complains that trial counsel failed to file a motion to sever his trial from that of his co-defendants, "[t]he decision regarding whether to file a motion to sever is a matter of trial tactics and strategy, and the fact that such a motion was not filed does not require a finding that trial counsel was ineffective." (Citations and punctuation omitted.) *Ross v. State*, 313 Ga. App. 695, 696 (1) (a) (722 SE2d 411) (2012). Moreover, Hannah has not demonstrated that a motion to sever would have succeeded. "[A]ntagonism between co-defendants is not

17

enough in itself to require severance, rather [Hannah] must also demonstrate that he was harmed by the failure to sever. [Hannah] has not made this showing; nor has he shown a reasonable likelihood that the outcome of his trial would have been different if severance had been granted." (Citations and punctuation omitted.) *Johnson v. State*, 287 Ga. 767, 770 (2) (700 SE2d 346) (2010).

During Ansley's cross-examination of Cameron, the prosecutor interposed an objection to a question by Ansley's counsel regarding the potential sentence to which Cameron was exposed as a result of her guilty plea. Hannah complains that his trial counsel was ineffective in failing to object to the prosecutor's objection because the prosecutor incorrectly stated the potential sentence as 30 rather than 10 years. See OCGA § 16-4-8. But, as the prosecutor noted at the hearing on the motion for new trial, Cameron's plea agreement, in which she was represented by counsel, itself recited that "for the offense(s) you have been charged with, you could be sentenced up to 30 YRS confinement." Thus "any possible bias the witness may have had" was not affected by the legal error on the part of the prosecutor. Moreover, as the trial court observed, an overstatement of the penalty may well have been more damaging to Cameron's credibility because it increased the likelihood of a perception of witness bias.

18

Hannah also complains that his trial counsel did not introduce certified copies of the jail trusty's criminal convictions. Trial counsel testified at the hearing on the motion for new trial and explained that he did not believe it necessary to do so because "he was already in jail and the jury knew it." The trusty appeared in the courtroom in a jail uniform, shackles, and handcuffs, and testified that he was "locked up in the Walton County jail" at the time the letter was given to him. "Strategic decisions regarding what witnesses to call, whether and how to conduct cross-examination, and all other tactical decisions are the exclusive province of the lawyer after consultation with his client." *Campos v. State*, 263 Ga. App. 119, 122 (587 SE2d 264) (2003). Counsel's testimony supported the trial court's conclusion that Hannah failed to demonstrate ineffective assistance on these grounds.

Finally, Hannah complains that his trial counsel improperly questioned a police officer regarding evidence that was excluded by a pretrial order to suppress. Trial counsel, while cross-examining the officer that arrested Brian Johnson, asked the officer the basis for Johnson's arrest, and the officer responded, "There was some other stuff that was said that I can't go into." Counsel persisted, and Ansley's counsel objected on the basis of hearsay. The trial court then excused the jury, and a discussion of the hearsay issue ensued, with the trial court's observing that it had

19

excused the jury to avoid placing objectionable testimony on the record. The issue of the suppression order was then raised by the witness himself.

At that point, the trial court discussed with counsel the best way to "limit the damage," and after conferring among themselves, Hannah's counsel offered to withdraw the question, and Ansley and Johnson's counsel moved for a mistrial. The trial court concluded that the best way to handle the situation was to allow Hannah's counsel to withdraw his question, and allow the prosecutor to elicit a statement that the arrest of Johnson was based on other unspecified information obtained by the police that day.

At the hearing on the motion for new trial, counsel acknowledged that he did not have any details regarding the arrest of Johnson. But he added that he was not concerned because neither the arresting officer nor his testimony involved his client, and that his question was merely intended to suggest that the police arrested Johnson because "he was a black man in Monroe;" he believed that it "was a question that really helped Quincy Hannah."

Hannah's claims are "judged by whether counsel rendered reasonably effective assistance, not by a standard of errorless counsel or by hindsight. The constitutional guarantee of effective legal assistance means that defendant is entitled to a fair trial

20

but not a perfect one, for there are no perfect trials." (Citations, punctuation, and footnotes omitted.) *Alexander v. State*, 319 Ga. App. 199, 203 (2) (734 SE2d 432) (2012). As the trial court observed, Hannah's trial counsel should have been aware of the suppression of the evidence in question, but Hannah failed to show that the outcome of *his* trial would have been different had his trial counsel not asked the question. Not only did the question have no direct connection with Hannah, the trial court immediately excused the jury before the question was answered, and crafted a series of questions for counsel to "correct any error that would otherwise have been induced." We cannot say that the trial court erred in denying Hannah's motion for new trial on this ground.

*Judgments affirmed. Doyle, P. J., and McFadden, J., concur.*