**THIRD DIVISION**
**MILLER, P. J.,**
**RAY and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 13, 2013**

# In the Court of Appeals of Georgia

A12A2365. COREY v. THE STATE.

BRANCH, Judge.

Charlette Zeigler Corey was charged with driving under the influence, failure to maintain lane, lack of proof of insurance, and driving with a suspended registration. She moved to suppress the evidence regarding driving under the influence on the ground that it was obtained illegally. The trial court denied the motion but granted a certificate of immediate review. This Court granted Corey's application for interlocutory appeal. We reverse.

The State has the burden of proving that a search or seizure was lawful. OCGA § 17-5-30. The arresting officer, Pieter-Michiel Geuze of the Cobb County Police Department, was the only witness at the hearing on the motion to suppress. Thus, the evidence was undisputed, and Corey does not dispute the officer's credibility.

"[W]hen evidence is uncontroverted and no question of witness credibility is presented, the trial court's application of the law to undisputed facts is subject to de novo appellate review." (Punctuation and footnote omitted.) *Hammont v. State*, 309 Ga. App. 395, 396 (710 SE2d 598) (2011). Finally, the trial court denied Corey's motion to suppress without explanation and therefore there are no findings of fact. We will construe the facts in favor of the trial court's decision. *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994).

Officer Geuze's testimony shows that on the evening of October 10, 2011, he was on duty and in uniform when he received a radio dispatch that an off-duty officer saw someone driving erratically and thought the driver could be intoxicated.[1] Geuze drove in a marked patrol car to a residential location and made brief contact with the off-duty officer. The officer advised that the vehicle had just pulled into the garage at the address; Geuze parked at the base of Corey's driveway. From there, Geuze saw Corey inside the open garage, half way between her vehicle and the interior entrance

---

[1] "Officers are entitled to rely on information provided by other officers or by their dispatcher when asked to be on the lookout for a certain vehicle or suspects. There is no requirement that the officer or officers providing the information testify at the motion to suppress [hearing]." (Citations omitted.) *Edmond v. State*, 297 Ga. App. 238, 239 (676 SE2d 877) (2009). And "hearsay is admissible during a suppression hearing when determining the existence of probable cause." (Citation omitted.) *Daniel v. State*, 298 Ga. App. 245, 248 (3) (679 SE2d 811) (2009).

to the home, which was on the driver's side of her vehicle. As Geuze walked up the driveway and into the garage, he identified himself, asked if he could talk to her, and began having a conversation with her about how she had been driving erratically. Geuze did not have a warrant, and he admitted that he neither asked for nor received consent from Corey to enter the garage. Geuze clarified that when he got to the top of the driveway, where the garage door is located , Corey was getting ready to enter her home; in Geuze's words, "she was hand on door handle, foot on step," and she was getting ready to lower the garage door as well. Beginning at about this point an audio recording is available that captures some of the conversation between Geuze and Corey, but not the very beginning; other parts are unintelligible.

Inside the garage, Geuze did not smell any alcohol , but Corey was holding a closed pharmacy medication bag in her hand with her name on it and she appeared to be unsteady on her feet. Geuze asked about the medications and asked other questions in an attempt to determine whether the medications could have made Corey drowsy. Corey stated that she was taking four medications; Geuze knew that at least one was a sleep-aid, and he saw icons on the bag that indicated some of the drugs could cause drowsiness and dizziness. Geuze noticed that Corey was unable to stand without swaying toward and away from him, a symptom that he knew to be associated with

3

alcohol consumption. Geuze also noticed that, despite it being a rainy day and somewhat dark in the garage, Corey had very small pupils, which could indicate the influence of medications. Geuze also saw that Corey had driven her car "into the end of the garage," or, into the wall, rupturing a container of liquid and damaging the wall.

Corey asked if she had done something wrong while driving. Geuze replied that based on what he had learned from an off-duty officer, he was concerned that she had been driving erratically. A different voice on the audio recording then asked "Is there anybody else inside the house?" And Corey can be heard to say "my children." Corey also said, "I have to urinate." Geuze replied, "Well, step right here with me for right now so we can . . ."; the end of the sentence is not audible on the recording. But in his testimony, Geuze explained that he "asked her to wait for him" or "to stand by." Other officers had arrived, and they stood with Corey while Geuze walked down the driveway.

For the next two minutes Geuze thoroughly questioned the off-duty officer about Corey's erratic driving. As a result, Geuze decided to pursue the investigation further; he also decided that Corey, who was still in the garage, was not free to leave. Geuze re-entered the garage and asked Corey if she had been drinking. She replied that she had only had a glass of wine and that she was under an extreme amount of

4

stress because her husband was incarcerated. Geuze and Corey spent the next several minutes discussing the possibility of Corey taking tests to determine if she was unsafe to drive. During this time, she refused to take an alco-sensor test, and Geuze explained the option of performing field sobriety tests. Also during this time, Corey said "All I want to do is go in the house and fall asleep"; "I just want to go home"; and "my children are in the house." Geuze did not allow Corey to go inside.

Geuze then had a two-minute conversation with his supervisor, Sergeant Jennings, during which Geuze stated that he did not smell alcohol. Based on that conversation and the information he had gathered so far, he decided to continue to investigate whether Corey had been driving under the influence of drugs. He returned to the garage and conducted standard field sobriety examinations. Another officer repositioned Geuze's patrol car so that the camera pointed up the driveway and into the garage where the tests were performed. At this point, Geuze and Corey were in the back left corner of the garage near the interior door to the house; Corey's vehicle was parked in the middle of a two-car space.

Based on three field sobriety tests, Geuze determined that Corey was less safe to drive as a result of the influence of drugs or alcohol, and he decided to take her into custody. She was arrested in her garage. Geuze read Corey the Georgia implied

5

consent information. Geuze also performed a computer check on Corey's vehicle registration and insurance and determined that the registration was suspended and that she was without valid insurance. At some point, Corey agreed to state-administered chemical tests of her blood and urine. On the way to the hospital, however, Corey indicated that she would not take the test and that she wanted to go to jail instead. Geuze never read Corey her *Miranda* rights.

1. Corey first contends the trial court abused its discretion by finding that Geuze was authorized to enter Corey's garage.

The Fourth Amendment protects against "unreasonable searches and seizures[.]" U.S. Const. Amend. IV. Even with probable cause, absent exigent circumstances or proper consent, warrantless searches and seizures within a home by officers in the pursuit of their traditional law enforcement duties are presumptively unreasonable. See, e.g., *Kentucky v. King*, __ U. S. __ (II) (A) (131 SC 1849, 179 LE2d 865) (2011); *Payton v. New York*, 445 U. S. 573, 589 (II) (100 SC 1371, 63 LE2d 639) (1980).[2] The protections afforded by the Fourth Amendment extend to the

[2] Officers are also authorized to enter a residence in response to non-law enforcement emergency situations involving a threat to life or property. See generally *Mincey v. Arizona*, 437 U. S. 385, 392-393 (I) (98 SC 2408, 57 LE2d 290) (1978); *Gilreath v. State*, 247 Ga. 814, 819-820 (1) (279 SE2d 650) (1981); *Love v. State*, 290 Ga. App. 486, 488 (659 SE2d 835) (2008).

home and its curtilage. *Oliver v. United States*, 466 U. S. 170, 180 (III) (A) 176 (II) (104 SC 1735, 80 LE2d 214) (1984); see also *United States v. Dunn*, 480 U. S. 294, 300 (II) (107 SC 1134, 94 LE2d 326) (1987). Thus, even if officers have probable cause to investigate a crime, without a warrant, exigent circumstances, or proper consent, they may not enter a home or its curtilage. See *Kirsche v. State*, 271 Ga. App. 729, 731 (611 SE2d 64) (2005).

(a) Although there may be a dispute about whether an attached garage is always considered a part of the home for the purposes of Fourth Amendment analysis,[3] we find that under the facts of this case, Corey's garage was entitled to full Fourth Amendment protection either as a part of the home itself or the protected part of its curtilage.

---

[3] See *Coffin v. Brandau*, 642 F3d 999, 1012-1013 (III) (11th Cir. 2011) (en banc, four judges dissenting) (refusing to extend full Fourth Amendment protection to attached garage as a matter of law; instead holding that given the specific circumstances of the case, including that the resident ordered the officers to leave and attempted to close the garage door in the presence of the officers in order to maintain privacy, garage was a *part of the curtilage of the home* even though the garage faced the street and was open when officers arrived). Compare *United States v. Oaxaca*, 233 F3d 1154, 1157 (A) (9th Cir. 2000) ("[N]o reason exists to distinguish an attached garage from the rest of the residence for Fourth Amendment purposes.") (citations omitted.)

"[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (Citation and punctuation omitted.) *Welsh v. Wisconsin*, 466 U. S. 740, 748 (II) (104 SC 2091, 80 LE2d 732) (1984). Here, the garage is connected to and part of the home itself: the two have an adjoining wall and an internal door connecting them, and they are essentially under the same roof. See *Payton*, 445 U. S. at 589 (II) ("[In no setting] is zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home"). Cf. *State v. Sims*, 240 Ga. App. 391, 393-394 (523 SE2d 619) (1999) ("A garage or basement door left open to admit light and air does not constitute a blanket invitation to the police to enter.").

In addition to the home itself, the Fourth Amendment protects a home's curtilage, as limited by the open fields doctrine.[4] *Espinoza v. State*, 265 Ga. 171, 172-173 (2) (454 SE2d 765) (1995). The Supreme Court of Georgia has defined curtilage as "the yards and grounds of a particular address, its gardens, barns, and buildings." (Citation and punctuation omitted.) *Landers v. State*, 250 Ga. 808, 809

---

[4] As held by the Supreme Court, "an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers." *Oliver*, 466 U. S. at 181 (III) (A). Thus, "only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home." Id. at 180 (III) (A).

8

(301 SE2d 633) (1983). And the United States Supreme Court has explained that "the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." (Citation omitted.) *Dunn*, 480 U. S. at 300 (II). That court also stated that "curtilage questions should be resolved with particular reference to four factors":

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home,[5] the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

(Citations omitted.) Id. at 301 (II).

The limited but undisputed evidence in the record shows that Corey used her garage for parking and for personally entering the living quarters of the home. The evidence shows that on this occasion, she intended to close the garage door as a part

---

5 [T]he term "curtilage" originally was understood at common law to refer to those structures and areas within the fence or wall that usually surrounded dwelling houses in England. But . . . the term is now understood to include any structures and areas upon residential property that are so near and so closely connected to the dwelling house as to be considered a part of it, whether or not enclosed with the dwelling house by a fence or wall.

*Rutter v. Rutter*, 316 Ga. App. 894, 900 (2) (a) n. 12 (730 SE2d 626) (2012) (citations omitted.)

9

of entering the home. There is no evidence that Corey routinely left her garage door open or had left it open that day while she was out. And there is no evidence that she allowed deliverymen or other members of the public to approach the home through the garage to reach the interior door to the home.[6] Thus the only evidence in the record shows that Corey treated her garage as part of the home itself and maintained an expectation of privacy therein. Accordingly, even if analyzed as a part of the curtilage, based on these undisputed facts we conclude that Corey's garage should be placed under the home's "umbrella" of Fourth Amendment protection. See *Dunn*, 480 U. S. at 301 (II).

(b) Geuze's entry into the garage was not authorized by law. At the time he entered the garage, Geuze had information from a person he understood to be an off-duty officer that Corey had been driving erratically and could be intoxicated. As explained below, this information may have been sufficient to constitute articulable suspicion of driving under the influence, but it alone did not give the officer probable cause to arrest for that offense. See, e.g., *Threatt v. State*, 240 Ga. App. 592, 596 (1)

---

[6] "[A]ny visitor, including a police officer, may enter the curtilage of a house when that visitor takes the same route as would any guest, deliveryman, postal employee, or other caller." (Citation, punctuation and footnote omitted). *State v. Gravitt*, 289 Ga. App. 868, 870 (2) (a) (658 SE2d 424) (2008).

10

(524 SE2d 276) (1999). But even if the officer may have had probable cause to arrest Corey for reckless driving, which we need not decide, there were no exigent circumstances sufficient to authorize entry for such an arrest. Id.

In *Threatt*, an identified, concerned citizen called 911 to report a car being driven in an erratic manner, and while on the phone with the police, she followed Threatt to his home and saw him go inside. Id. at 593. An officer arrived, interviewed the citizen, checked the registration on Threatt's car, and, along with a second officer, knocked on Threatt's apartment door. Id. When a woman opened the door and the officers saw Threatt, one of the officers "stepped a short distance – about two feet – inside the apartment," for "the purpose of investigating his suspicion that the man had been driving under the influence of alcohol." Id. The officer also stated that he was concerned that the evidence of alcohol in the suspect's blood would diminish with time. Id. at 593-594. Inside the apartment, the officer then questioned the suspect and smelled the odor of alcohol, all of which eventually led to his arrest for driving under the influence. Id. at 594.

This Court held that although at the time they entered the apartment the officers had a reasonable articulable suspicion of DUI for a brief *Terry* investigation, they did not have probable cause to arrest for that offense, and therefore they had no basis for

11

entry into the home without a warrant or consent, even in the face of the dissipation of the evidence of alcohol. Id. at 595-596 (1). The Court also held that even if the officers had probable cause to arrest for reckless driving before entering the home, the circumstances were not sufficiently exigent to justify a nonconsensual, warrantless entry. Id. "The reckless operation of the car and the consequent threat to public safety had ended." Id. at 596 (1). The facts of the present case are similar, and we similarly conclude that Geuze's entry into Corey's garage was not supported by a combination of probable cause and exigent circumstances. See also *Smith v. State*, 262 Ga. App. 614, 620-621 (3) (585 SE2d 888) (2003) (officer violated the Fourth Amendment when, without consent or exigent circumstances, he leaned through the doorway and looked into apartment).

(c) The State's primary argument, and the trial court's greatest concern at the hearing , was whether Corey impliedly consented to Geuze entering the garage given that he began conversing with Corey as he walked up the driveway and into the garage and given that Corey did not tell Geuze to stop or not to enter. The State has the burden of proving that the consent was voluntary under the totality of the circumstances and that it was not the result of express or implied coercion. *Liles v. State*, 311 Ga. App. 355, 358 (1) (716 SE2d 228) (2011); *Pledger v. State*, 257 Ga.

12

App. 794, 796-797 (572 SE2d 348) (2002). We must construe the trial court's order as having determined that Corey consented to Geuze's entry and uphold that finding if there is any evidence to support it. *Liles*, 311 Ga. App. at 356. Nevertheless, this Court is "required to scrutinize closely an alleged consent to search." *Johnson v. State*, 297 Ga. App. 847, 848 (678 SE2d 539) (2009).

Geuze admitted he did not ask Corey for permission to enter the garage. And when Geuze was asked if Corey gave consent for him to enter, Geuze replied, "At no particular time did she offer or forward to me such consent." Geuze never testified that he interpreted any of Corey's behavior as consent. With regard to the surrounding circumstances, according to Geuze's own testimony, Corey had moved from halfway between her car and the internal door all the way to that door as Geuze climbed the driveway, and by the time he entered the garage, Corey had her hand on the doorknob, her foot on the step to go in, and she was about to close the garage door. Geuze testified that at this point Corey was getting ready to enter her home.

Although Geuze testified that he began the conversation outside the garage, identified himself, and asked Corey if he could talk to her, and although Corey never asked Geuze to stop or not enter the garage, Geuze expressly testified that Corey did not consent to entry. There is no evidence that Corey spoke before Geuze entered or

13

that she even looked at him. The only evidence of body language is that she had not turned to face him or otherwise responded to anything that he had already said. And even if Corey did speak before Geuze entered the garage, without more, we can infer only that Corey consented to a conversation, not to Geuze's entry into the garage. See generally *State v. Jourdan*, 264 Ga. App. 118, 121 (1) (589 SE2d 682) (2003) ("Mere acquiescence to the authority asserted by a police officer cannot substitute for free consent") (citation and footnote omitted).

Moreover, the fact that Corey continued the conversation with Geuze after that point does not establish consent. See generally *Bolton v. State*, 258 Ga. App. 217, 218 (573 SE2d 479) (2002) ("consent to search was obtained pursuant to an illegal entry and the consent to search was thereby the 'fruit of the poisonous tree'"). In order to interpret Corey's continued conversation with Geuze after his illegal entry as consent for Geuze's presence in the garage, we would have to find the consent was "sufficiently attenuated or distinguishable from the illegality to be purged of any taint," as opposed to "the product of and tainted by the illegality." (Citation and punctuation omitted.) *Watson v. State*, 302 Ga. App. 619, 623 (691 SE2d 378) (2010). See also *Pledger*, 257 Ga. App. at 797. Here, after Geuze entered Corey's home and at the same time that he was talking to her, he was in the process of noticing how she

14

parked her vehicle, how she was holding a bag of prescription medications, and how she appeared unsteady on her feet. Furthermore, in this initial encounter, Corey expressed concern about her children and she stated that she had to urinate, which Geuze did not allow her to do. Instead he asked her to stand by with two other officers present while he went to talk to the off-duty officer who made the initial call, following which Geuze decided that Corey was not free to leave. Thus, Corey continued to try to disengage, but Geuze would not allow it.

In sum, Geuze did not have proper authority to enter Corey's garage and the subsequent conversation was not sufficiently attenuated from the illegal entry to be purged from the taint. Geuze therefore violated Corey's Fourth Amendment Rights. Accordingly, the trial court erred by denying her motion to suppress insofar as it covered evidence gathered as a result of the illegal entry, primarily all evidence obtained in Corey's garage. Cf. *State v. Shephard*, 248 Ga. App. 433, 436 (1) (546 SE2d 823) (2001) (affirming grant of motion to suppress where officers entered home of alleged drunk driver without consent or exigent circumstances).

2. Corey also contends her statements must be suppressed because Geuze never read *Miranda* warnings to her. Because we hold that all evidence obtained in Corey's garage must be suppressed, we need not determine whether Corey's statements, at

15

least through the time of her arrest, must be suppressed because of a violation of *Miranda*.[7] Nevertheless, Corey eventually was arrested in her garage and never given any *Miranda* warnings. *Smith v. State*, 262 Ga. App. at 617 (2) ("Miranda protections apply when an individual is either (1) formally arrested or (2) restrained to the degree normally associated with a formal arrest.") (citation omitted). Therefore any incriminating statements Corey made subsequent to her arrest were made without the protection of *Miranda* and may not be introduced. See *Shephard*, 248 Ga. App. at 436 (2) (affirming suppression of statements made by defendant after he was taken into custody tantamount to arrest but never given *Miranda* warnings).

*Judgment reversed. Miller, P. J., and Ray, J., concur.*

---

[7] See generally *State v. Oliver*, 261 Ga. App. 599, 601 (583 SE2d 259) (2003) ("During a second-tier encounter, an officer is permitted to question a suspect to gather evidence of possible intoxication. Additionally, an officer may conduct field sobriety tests, even in the absence of *Miranda* warnings.") (footnotes omitted).