**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**May 21, 2014**

# In the Court of Appeals of Georgia

A14A0390. ARP v. THE STATE.

BRANCH, Judge.

In an attempt to arrest Christopher Watson pursuant to an arrest warrant, law enforcement officers entered the curtilage of Kenneth Ray Arp's home by approaching Arp's back door where, based on the officers' observations of events inside the house, they entered without consent and discovered marijuana. Watson had no relation to Arp, was not in Arp's home, and did not live there. After a stipulated bench trial, Arp was convicted of marijuana possession and making terroristic threats. On appeal, Arp contends the trial court erred by denying his motion to suppress the evidence used against him. He contends that neither the arrest warrant nor the surrounding circumstances authorized the officers to enter the curtilage of his home and that, therefore, the ensuing search was illegal. We agree and reverse.

A trial judge's findings of fact on a motion to suppress should not be disturbed if there is any evidence to support them; determinations of fact and credibility must be accepted unless clearly erroneous; and the evidence must be construed most favorably to the upholding of the trial court's findings and judgment. *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994); *Jackson v. State*, 258 Ga. App. 806, 807-808 (2) (575 SE2d 713) (2002). Where the trial court denies the motion to suppress without explanation or findings of fact, we construe the facts in favor of the trial court's decision. *Corey v. State*, 320 Ga. App. 350, 351 (739 SE2d 790) (2013).

The record of the hearing on the motion to suppress shows that on February 5, 2013, Sergeant Dan Blythe of the Henry County Police Department and other officers from Flint and Clayton County were attempting to arrest Watson pursuant to an arrest warrant dated January 10, 2013 for misdemeanor obstruction of an officer, which listed Watson's address as 137 Chestnut Lane in McDonough. Blythe was familiar with Watson and his family, and Blythe and other officers were aware that Watson had a reputation of running from and fighting with police, stealing, and breaking into houses. In fact, Watson had fled some of the same officers earlier that day.

Blythe and the other officers went to the Watson home at the address shown on the warrant and spoke with Watson's mother, but Watson was not there. Watson's

2

mother told the officers that Watson had been picked up that day by a woman named Wendy Wilson in a small red car. Blythe then used a police computer to determine that Wilson had a "previous address" or "last known location" of 487 Lakeshore Drive. Both Blythe and other officers knew that the house located at 487 Lakeshore Drive was not Watson's residence. The officers did not have a search warrant for the Lakeshore Drive address, and they did not perform a computer search to determine if Wilson still lived there or who was listed as a resident.

Blythe and the other officers drove to 487 Lakeshore Drive, arriving in the dark, and they saw a red Chrysler Sebring parked either in the driveway or on the side of the property, facing out, such that the license tag could only be seen from the back. While other officers approached the front door, Blythe, Sergeant Romano, and Sergeant Fowler ran past the Chrysler to the back of the property without stopping to check the license tag of the red car as they passed it. Blythe testified that he saw there was no fence in the back, "so we found the back door and kind of got in the area of the back door while the other agents knocked on the front door"; Romano was positioned "just shy of the back door." The blinds were partially up on the window located beside the back door. Blythe also testified that before he got to the door, he saw movement inside of the house from a point near the property line and that he and

3

Fowler then moved up to the back door and window to see what was happening and for officer safety, to make sure that the person was not grabbing a weapon. From his position at the back door, Blythe looked through the window and saw a woman speak with another person in a hallway at the door to the bedroom. Blythe then saw the woman run into the bedroom where she grabbed something, then run to the bathroom, run back to the bedroom to grab a closed, clear plastic container, and come back to the bathroom, passing so close to Blythe that he could see what appeared to be marijuana in the container.

Blythe told Fowler and Romano what he had seen, and the officers therefore decided to enter the back door of the house "for the sole purpose of preventing [the woman] from destroying what we believed to be . . . marijuana." The officers yelled "police," opened the unlocked back door, and seized the marijuana in the bathroom. Based on the seizure and Arp's statements to Sergeant Romano after Romano entered the home, Arp was charged with possession of more than an ounce of marijuana and with making terroristic threats. Neither Watson, the subject of the arrest warrant, nor Wilson were found in the Arps' home.

Arp testified that his wife had purchased the home in foreclosure the previous June or July and that Arp owned the Chrysler. Arp testified that the Chrysler was

4

parked in his front yard, not in the driveway. He testified that he did not know Watson or Wilson and that when officers arrived at his front door that night, he opened the door but did not consent to the officers entering the home.

Arp moved to suppress all the evidence and alleged contraband seized in his home including any fruit of the illegal search and seizure. The trial court denied Arp's motion without explanation or findings of fact. In accordance with a stipulation of the parties, the court adopted the testimony from the hearing on the motion to suppress as the trial evidence and, based on that and other stipulated evidence, the court found Arp guilty of possession of marijuana and making terroristic threats. Arp appeals the ruling on the motion to suppress.

1. The Fourth Amendment protects against "unreasonable searches and seizures[.]" U.S. Const. Amend. IV. This protection has been interpreted to mean that even if officers have probable cause, absent exigent circumstances or proper consent, warrantless searches and seizures within a home by officers in pursuit of their traditional law enforcement duties are presumptively unreasonable. See, e.g., *Kentucky v. King*, ___ U. S. ___ (II) (A) (131 SCt 1849, 179 LE2d 865) (2011); *Payton v. New York*, 445 U. S. 573, 589 (II) (100 SCt 1371, 63 LE2d 639) (1980). The United States

5

Supreme Court has further clarified that an arrest warrant is an insufficient basis, standing alone, to search a third party's home:

> [E]ven when armed with an arrest warrant, police must have either a search warrant, exigent circumstances or consent to lawfully enter a third person's home to arrest someone who does not reside there. *Steagald v. United States*, 451 U. S. 204, 212-215 (III) (101 SCt 1642, 68 LE2d 38) (1981); *King v. State*, 217 Ga. App. 889, 891, 459 SE2d 605 (1995).

*Brown v. State*, 240 Ga. App. 321, 322 (1) (523 SE2d 333) (1999). In *Steagald*, the Supreme Court held that even if officers have a reasonable belief that the subject of the arrest warrant is in the third party's home, the officers may not enter that home without a search warrant, exigent circumstances or consent. *Steagald*, 451 U. S. at 214 (III). The protections afforded by the Fourth Amendment extend to the home and its curtilage. *Oliver v. United States*, 466 U. S. 170, 180 (III) (A) (104 SCt 1735, 80 LE2d 214) (1984); see also *United States v. Dunn*, 480 U. S. 294, 300 (II) (107 SCt 1134, 94 LE2d 326) (1987); *Kirsche v. State*, 271 Ga. App. 729, 731 (611 SE2d 64) (2005) (even if officers have probable cause to investigate a crime, without a warrant, exigent circumstances, or proper consent, they may not enter a home or its curtilage). Finally, the State has the burden of proving that a search or seizure was lawful. OCGA § 17-5-30 (b).

Arp does not contest that if the officers were properly located at the back door, they had authority to look in the window and, upon observing what appeared to be contraband and an attempt to dispose of it, authority to enter the home to prevent the destruction of evidence and to seize it. See *King v. State*, 289 Ga. App. 461, 463-464 (2) (657 SE2d 570) (2008), and cases cited therein. Rather, he contends that the officers were not authorized to enter his back yard or the back door area in the first place. We agree.

First, the back yard and back door area of the Arps' home fall within the general definition of the curtilage of the home. Curtilage has been described as "the area immediately surrounding a dwelling house," and the extent of the curtilage "is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Dunn*, 480 U. S. at 300 (II) (citation omitted). The Supreme Court of Georgia has defined curtilage as "the yards and grounds of a particular address, its gardens, barns, and buildings." *Espinoza v. State*, 265 Ga. 171, 173 (2) (454 SE2d 765) (1995) (citation and punctuation omitted). "It is the general rule that a warrant is required to search the curtilage, and the yard immediately surrounding one's dwelling is well within the curtilage." (Citations omitted.) *Phillips v. State*, 167 Ga. App. 260, 261 (1) (a) (305 SE2d 918)

7

(1983). See, e.g., *Rivers v. State*, 287 Ga. App. 632, 634 (1) (b) (653 SE2d 78) (2007) (curtilage included hedge area adjacent to side of house even if the back yard was exposed to an alley and not enclosed by a fence); *Brooks v. State*, 237 Ga. App. 546, 548 (2) (515 SE2d 851) (1999) (truck parked outside back door of mobile home was within curtilage of premises).

Second, the State did not carry its burden of showing an exception to Arp's Fourth Amendment right to protection of the back yard/door curtilage of his home. A photograph of the back of the house shows that neither the door nor the window are visible from the front of the house and that they could only have been seen from the back yard. And the State did not present any other evidence to show that the back door and window were visible or in plain view from the street or from anywhere the officers were authorized to be upon arriving at the home. See *Galbreath v. State*, 213 Ga. App. 80, 82 (2) (443 SE2d 664) (1994) ("objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence") (citation and punctuation omitted). Nor is there evidence that Arp and his wife treated the back door as a public entrance or that officers were unable to approach the front door or received no response at the front door, any of which may have authorized the officers to proceed to the back yard and

8

door. See *State v. Zackery*, 193 Ga. App. 319 (387 SE2d 606) (1989); *State v. Lyons*, 167 Ga. App. 747, 748 (307 SE2d 285) (1983).

Thus, the State did not carry its burden of showing that the officers were authorized to proceed to the back door and window area of the Arps' home; the officers therefore entered the protected curtilage of the Arps' home before they could see the window through which they noticed activity that aroused a concern for officer safety. That concern, therefore, cannot be used to justify the three officers' entry into the back yard in the first place. See generally *Kirsche*, 271 Ga. App. at 733 (police may not make protective sweep of house or curtilage without a reasonable and articulable suspicion that area "may be harboring someone who poses a danger to them") (citation omitted). Compare *Alvarez v. State*, 312 Ga. App. 552, 557 (2) (718 SE2d 884) (2011) (officer's entry into back yard was justified by exigent circumstances of officer safety because he had reason to believe that someone at residence was armed with a gun).

2. Given that Arp did not consent to a search and that the officers did not have a search warrant to enter the curtilage of the home, the State's position, therefore, turns on whether the State carried its burden to show that the officers' entry into Arp's backyard and the back door area was justified by exigent circumstances. *Leon-*

*Velazquez v. State*, 269 Ga. App. 760, 762 (1) (605 SE2d 400) (2004) ("Since the officer had neither consent nor a search warrant, he was required to have exigent circumstances [to enter a third party's home in an attempt to execute a search warrant].") (footnote omitted).

> Whether exigent circumstances existed is a question of fact, and we review police actions from the standpoint of a hypothetical reasonable officer and must measure those actions from the foresight of an officer acting in a quickly developing situation and not from the hindsight of which judges have benefit.

*Lawrence v. State*, 298 Ga. App. 94, 97-98 (679 SE2d 94) (2009) (punctuation and footnote omitted).

At the time that Blythe, Fowler and Romano entered the curtilage of Arp's home, the following facts existed: the officers had a warrant for Watson's arrest; the officers knew Watson to be a flight risk; one or more officers in the larger group of officers had witnessed Watson flee earlier that day; Watson's mother said Watson was with Wilson in a red car; Wilson's last known address in the police information system was 487 Lakeshore Drive; the Lakeshore Drive home was not where Watson lived; the officers discovered a red Chrysler parked at that address that evening; and Blythe and the other officers went to the back of the property because "Watson is

10

personally known to me to run." What Blythe and the officers who went to the back door did not know is whether anyone answered the front door, whether the house or the Chrysler actually belonged to Wilson, or whether either Wilson and Watson were present at the Arps' home.

In general an exigent circumstance "is the officer's reasonable belief that such action is a necessary response on his part to an emergency situation." *Leon-Velazquez*, 269 Ga. App. at 762 (1) (punctuation and footnote omitted). "Exigent circumstances include where an officer is in hot pursuit of a fleeing felon, where an officer reasonably fears the imminent destruction of evidence if entry into the residence is not immediately effected, and where an officer reasonably perceives that a suspect within the dwelling poses a risk of danger to the police or others." *Minor v. State*, 298 Ga. App. 391, 396-397 (1) (b) (680 SE2d 459) (2009) (citation, punctuation and footnote omitted).

Even considering all of the above facts combined, we find no exigent circumstances to enter the Arps' home or its curtilage. In *Steagald*, the officers sought to arrest a federal fugitive and they had a reasonable belief that the fugitive might be a guest in the third-party's home. *Steagald*, 451 U. S. at 213 (III). Yet the high court held that "forcible entry into a third party's house was permissible only when the

person to be arrested was pursued to the house," i.e., only when the officers were in "hot pursuit," which they were not in *Steagald*. Id. at 218 (IV) (A). The court held that the inconvenience arising from the fact that people are "inherently mobile, and thus officers seeking to effect an arrest may be forced to return to the magistrate several times as the subject of the arrest warrant moves from place to place," is "simply not that significant." Id. at 221-223 (IV) (B).

Here, there is no evidence that the officers were in hot pursuit of Watson. The officers simply went to Wilson's "last known address" and saw a red Chrysler; they had not previously seen the car themselves and were simply following up on Watson's mother's statement about Watson leaving his own home. And they knew that the Lakeshore Drive home was not Watson's residence. Compare *Carter v. State*, 308 Ga. App. 686, 688 (1) (708 SE2d 595) (2011) (arrest warrant for defendant, a flight risk, executed at his place of residence and where he was believed to be, gave officers authority to enter back yard; distinguishing *Steagald* and other cases where there was "no evidence that the subject of the arrest warrant resided in the third party's home"). Although Watson was a flight risk, nothing stopped the officers from setting up a perimeter and attempting to obtain a warrant to search the Arps' home. Because the officers were not authorized to enter the curtilage of the Arps' home, they were not

in a place that they were authorized to be when they saw movement inside of the house or saw Arp's wife carrying a plastic container of what appeared to be marijuana. The trial court therefore erred by denying Arp's motion to suppress. Because all of the evidence against Arp presented by the State was discovered as a result of the officer's illegal search, there was insufficient evidence for a rational trier of fact to find Arp guilty on either charge. *Hamlett v. State*, 323 Ga. App. 221, 234 (2) (753 SE2d 118) (2013). Therefore his convictions on both counts must be reversed.

*Judgment reversed. Barnes, P. J., and Boggs, J., concur*.