**SECOND DIVISION**
**MILLER, P. J.,**
**RICKMAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 10, 2020**

# In the Court of Appeals of Georgia

A19A1758. LITTLE v. THE STATE.

PER CURIAM.

Following a bench trial, the trial court convicted Travis Little of several controlled substance offenses. On appeal, Little contends that the trial court erred when it denied his motion to suppress evidence obtained during a warrantless search of his home. Because the law enforcement officers did not have a warrant to enter and search Little's home, and their entry was not authorized by a valid exception to the warrant requirement, we reverse.

"When a defendant moves to suppress evidence based on an illegal search, the state must bear the burden of proving that the search was lawful." (Citation omitted.) *Leon-Velazquez v. State*, 269 Ga. App. 760, 761 (1) (605 SE2d 400) (2004); see also OCGA § 17-5-30 (b). On appeal from a ruling on a motion to suppress, we construe

the facts in favor of the trial court's decision. *Corey v. State*, 320 Ga. App. 350, 351 (739 SE2d 790) (2013). Nevertheless, where, as here, only a single witness testified at the suppression hearing, the "evidence is uncontroverted, and no question of witness credibility is presented, the trial court's application of the law to undisputed facts is subject to de novo appellate review." (Citation and punctuation omitted.) Id. at 350.

So viewed, the record shows that in 2008, Little pled guilty in Catoosa County to several controlled substance offenses and possession of a firearm by a convicted felon, and the trial court imposed a total sentence of five years in prison, to be followed by fifteen years on probation. In late February 2017, Chattooga County sheriff's department narcotics agent Gary Campbell "received information" from an unidentified source that Little was "moving large amounts of methamphetamine" and lived in a camper behind his mother's house in Chattooga County. Campbell knew at that time that Little was on probation following convictions for possession of methadone and methamphetamine.

Consequently, on March 7, 2017, Campbell and two other agents drove to Little's camper and knocked on the door. Little opened the door, "turned about as white as [a] piece of paper[,] and started shaking." Campbell identified himself and

2

the agents, told Little that Campbell had received information that Little was selling large amounts of methamphetamine, and asked if the agents could enter the camper to speak with Little.[1] Little backed up into the camper, and the agents followed him in. As the agents followed him in, Little turned around and began walking away while trying to empty his pockets.

Once inside the camper, Campbell saw hunting knives, a pair of brass knuckles, a small ziplock bag, a "meth pipe," and a set of electronic scales, all in plain view. Due to the presence of weapons, another agent placed Little in handcuffs but told him that he was not under arrest. Little told the agents that his sister also was in the camper, and, at Campbell's request, the sister emerged from a back room. Campbell asked her to empty her pockets after learning that she also was on probation. She complied and removed from one of her pockets a clear plastic "baggie" that contained what appeared to be methamphetamine.

Campbell requested and received consent from Little to search the camper. Around the same time, another agent conducted a pat-down search of Little and found $3,129 in his wallet and pockets. Little told the agents that "he could help [them] if

[1] Campbell specifically testified that he "told [Little that the agents] wanted to come in and talk to him," as opposed to requesting permission to do so. Campbell could not recall whether Little orally responded to the request to enter the camper.

3

[they] could help him." Campbell responded that the agents "couldn't do anything [until they] recovered the rest of the methamphetamine that he possibly had in the trailer" and asked Little "where it was at." Little directed the agents to a black bag on a bed, in which they found various controlled substances and drug paraphernalia. Little subsequently made several incriminating statements to the agents after being informed of, and waiving, his *Miranda*[2] rights.

A grand jury indicted Little for trafficking in methamphetamine (OCGA § 16-13-31 (e)), possession with intent to distribute methamphetamine (OCGA § 16-13-30 (b)), and possession of methamphetamine, oxycodone, hydrocodone, alprazolam, and clonazepam (OCGA § 16-13-30 (a)). Little subsequently moved to suppress the evidence obtained during the search of his home. The trial court conducted a joint bench trial and suppression hearing, during which a single witness, Agent Campbell, testified to the events described above. The trial court denied the motion to suppress after concluding that the agents knew when they visited Little's camper that he was on probation, he "in essence" allowed the agents to enter the camper, and he subsequently voluntarily consented to the search. The trial court found Little guilty of all seven counts, merged Counts 2 and 3 into Count 1, and imposed a total sentence

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LEd2d 694 (1966).

4

of 20 years in prison, to be followed by 10 years on probation. Little filed a motion for a new trial, which the trial court denied after a hearing, and this appeal followed.

1. Little contends that the trial court erred when it denied his motion to suppress because the agents' warrantless entry into his camper was unauthorized by either the conditions of his probation or his purported consent.[3] We agree.

The Fourth Amendment to the United States Constitution protects against "unreasonable searches and seizures." U. S. Const. Amend. IV.

> [P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest.

(Citation omitted.) *Liles v. State*, 311 Ga. App. 355, 357 (1) (716 SE2d 228) (2011). "Even with probable cause, absent exigent circumstances or proper consent, warrantless searches and seizures within a home by officers in the pursuit of their traditional law enforcement duties are presumptively unreasonable." *Corey*, 320 Ga. App. at 353 (1); see also *Williams v. State*, 296 Ga. 817, 819 (771 SE2d 373) (2015)

---

[3] It is undisputed that the agents lacked a search or arrest warrant when they entered Little's camper.

5

(a warrantless search is per se unreasonable, "subject only to a few specifically established and well-delineated exceptions.").

"[T]he Fourth Amendment applies to probationers as well as other citizens." (Citations omitted.) *Jones v. State*, 282 Ga. 784, 784-785 (1) (a) (653 SE2d 456) (2007). While probationers' Fourth Amendment rights may be restricted, any such restriction requires a "valid law, legally authorized regulation, or sentencing order" giving notice to the probationer of the restriction. Id. at 785-788 (1) (a). "[A] waiver of Fourth Amendment rights as a condition of parole, probation, or pretrial release," however, "cannot be used to justify a search by law enforcement officers who were unaware of the waiver at the time of the search." *Cantrell v. State*, 295 Ga. App. 634, 638 (2) (673 SE2d 32) (2009).

"[A]lthough silence in the face of a request for permission to search may, when accompanied by other conduct, sometimes be interpreted as acquiescence, such acquiescence cannot substitute for free consent." (Punctuation omitted.) *State v. Williams*, 212 Ga. App. 164, 165 (1) (441 SE2d 501) (1994). Thus, "[t]he State cannot meet its burden of demonstrating voluntary consent when the record shows only acquiescence to a claim of lawful authority." (Citation omitted.) *Johnson v.*

6

*State*, 297 Ga. App. 847, 849 (678 SE2d 539) (2009); see also *State v. Austin*, 310 Ga. App. 814, 817 (1) (714 SE2d 671) (2011) ("[V]oluntariness must reflect an exercise of free will, not merely a submission to or acquiescence in the express or implied assertion of authority") (citation omitted); *State v. Harris*, 236 Ga. App. 525, 528-529 (2) (b) (ii) (513 SE2d 1) (1999) (the defendant's act of emptying her purse–without saying anything–in response to an officer's request to do so, "may well have signaled acquiescence, [but] did not show consent"); *State v. Williams*, 226 Ga. App. 346, 347-348 (486 SE2d 637) (1997) (the trial court did not err in finding that the defendant's act of raising his hands when an officer asked, "Does anybody have any weapons on them?" was insufficient to establish voluntary consent to a pat-down search); *Rogers v. State*, 206 Ga. App. 654, 660-661 (4) (426 SE2d 209) (1992) (the defendant's statement that he "understood," in response to an officer's statement that the officer wanted to search the defendant's person during an illegal detention, was insufficient to show consent under the totality of the circumstances); *Miranda v. State*, 189 Ga. App. 218, 221 (3) (375 SE2d 295) (1988) (reversing the denial of a motion to suppress, because, "[w]hile [the defendant's] conduct in opening her bag and removing two garments, an action which did not reveal any contraband, may well have signaled acquiescence" in response to an officer's request for permission to

7

search the bag during an illegal detention, it did not show consent under the totality of the circumstances).

Here, no evidence was presented that the officers identified themselves before Little opened the door, and the record does not indicate that Little was aware of the officers' presence or identity before he opened the door. Consequently, the act of opening the door, by itself, was not indicative of consent for law enforcement to enter. Compare *Liles*, supra, 311 Ga. App. at 356, 358 (1) (the trial court was authorized to find that the defendant consented to an officer's entry into his hotel room where, inter alia, before the defendant opened the door, the officer identified himself and told the defendant that he smelled marijuana smoke coming from the room). Moreover, viewed in the light most favorable to the State, the evidence shows that, when the agents subsequently requested permission to enter, Little made no effort to engage in any discussion of the matter and instead continued to back up into the camper and turn his back on the agents. Nothing in Campbell's testimony indicates that Little affirmatively or voluntarily granted consent for the agents to enter. His actions rather show–at most–"a submission to or acquiescence in the

8

express or implied assertion of authority."[4] *Austin*, 310 Ga. App. at 817 (1); see also *Johnson*, supra, 297 Ga. App. at 849. The evidence at the suppression hearing was thus insufficient for the State to meet its burden of showing voluntary consent to entry. See *Johnson*, supra, 297 Ga. App. at 849; see also *Harris*, supra, 236 Ga. App. at 528-529 (2) (b) (ii); *Williams*, supra, 226 Ga. App. at 347-348; *Rogers*, supra, 206 Ga. App. at 660-661 (4); *Miranda*, supra, 189 Ga. App. at 221 (3).

---

[4] During Campbell's testimony, the prosecutor asked, "When you entered – so you asked him to come in and he backed in indicating to you that y'all could enter?" to which Campbell replied, without elaboration, "Yeah." The State's isolated apparent attempt to elicit a characterization of the intent behind what was, at best, an ambiguous action by Little adds nothing to our analysis, for several reasons. First, the State's question essentially asked Campbell what he thought Little was thinking as he backed up. Campbell, however, provided no objective basis for his opinion in this regard such as testimony identifying specific facts he observed that would lead a reasonable person to believe that the act of backing up conveyed free and voluntary consent for law enforcement to enter his home, rather than mere acquiescence to authority. As a result, this brief, isolated exchange at most reveals only Campbell's subjective interpretation of an otherwise largely equivocal action and thus does not constitute a conflict in the testimony. Second, when viewed in its entirety, Campbell's testimony establishes that Little began backing up before or at the same time as Campbell "told him [that the agents] wanted to come in," and, after the initial exchange at the camper door, Little continued to move backward. Thus, even if continuing the act of backing up was in direct response to a request to enter, it still constituted no more than acquiescence to authority and thus was insufficient for the State to meet its burden of showing that Little affirmatively and voluntarily granted consent to enter.

Moreover, pretermitting whether the conditions of Little's probation (which were imposed in another county) potentially authorized the agents to enter his home without his consent,[5] any such conditions may not support the entry at issue here because the State presented no evidence that any of the agents were aware that Little was subject to any such conditions as part of his probation when they entered his home.[6] See *Cantrell*, supra, 295 Ga. App. at 638 (2). Consequently, the State has not met its burden of showing that an exception to the warrant requirement authorized the agents' entry into Little's home, and the trial court erred by ruling otherwise.

---

[5] See generally, e.g., *Jones*, supra, 282 Ga. at 786-788 (1) (a) (a defendant must be on notice of a Fourth Amendment waiver as a condition of probation at the time of a search for the waiver to be valid).

[6] The State's discussion in its appellate brief regarding "customary" conditions of probation in the trial court's circuit is unavailing because no such evidence was presented, adduced, or judicially noticed below. The only evidence that was produced below that the State points to was the testimony from Little's trial counsel that, in his experience, the judges and prosecutors have "covered the issue." We do not find this evidence sufficient to establish that the judicial circuit has a custom of including waivers, at least up to the point of creating a presumption that every individual, including Little, would have such a waiver. We also note that this discussion also ignores that the inquiry is whether law enforcement officers are aware of the probation conditions imposed on the *particular individual* and whether that *particular individual* has waived his rights. See *Cantrell*, supra, 295 Ga. App. at 639 (2) ("A contrary holding would give police broad license to engage in legally unjustified searches in the hope that the subjects fall within the increasingly broad category of persons who have been called upon to waive their Fourth Amendment rights.").

10

2. In light of our ruling in Division 1, we also address whether Little's consent to the search of the camper following the agents' entry authorized the ensuing search. We conclude that it did not.

Evidence obtained as a result of a consent to search that itself is a result of an illegal entry into one's home must be suppressed as the "fruit of the poisonous tree." See *Watson v. State*, 302 Ga. App. 619, 624 (1) (691 SE2d 378) (2010) .

> [W]here, as here, the consent followed an illegal entry into the defendant's home, we examine the totality of the circumstances to determine whether the consent was voluntary because it was obtained by means sufficiently attenuated or distinguishable from the illegality to be purged of any taint, or whether the consent was invalid because it was the product of and tainted by the illegality. . . . The relevant factors to be considered include the temporal proximity to the illegal entry, the intervening circumstances and the purpose and the flagrancy of the official misconduct.

(Citations omitted.) Id. at 623 (1). To eliminate any taint from an allegedly consensual search resulting from a prior illegality, "there must be proof both that the consent was voluntary and that it was not the product of the prior illegality. Proof of a voluntary consent alone is not sufficient." (Citation omitted.) *Rogers*, supra, 206 Ga. App. at 660 (4). The inquiry "focuses on causation: Whether, granting establishment of the

11

primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (Citation and punctuation omitted.) *Pledger v. State*, 257 Ga. App. 794, 797 (572 SE2d 348) (2002).

Here, Little's consent to search is inextricably intertwined with the agents' illegal entry and their immediate observation of drug paraphernalia and weapons in plain view. See *Watson*, supra, 302 Ga. App. at 623 (1) (concluding that the defendant's consent to search his trailer "was not sufficiently attenuated from" a deputy sheriff's illegal entry, "but instead was an immediate response to it"); *Pledger*, supra, 257 Ga. App. at 799 (reversing the denial of a motion to suppress on grounds that, inter alia, the defendant's consent to search her home "was obtained immediately after she was illegally seized by the police," and "[t]he record reveal[ed] no intervening circumstances that would attenuate the causal chain."). Our determination is supported by Little's offer that "he could help [the agents] if [they] could help him," which appeared to be an immediate response to what the officers saw upon entry. See *Austin*, supra, 310 Ga. App. at 818-820 (a handcuffed defendant, who had voluntarily directed police to a gun under his bed, did not "freely and voluntarily consent[] to expanding the search," but rather merely "acquiesced," when one officer,

12

who had seen a small amount of marijuana in plain view, asked the defendant where additional guns or drugs might be found in the house). Moreover, the State has pointed to no intervening events between the agents' initial entry into Little's home and the subsequent collection of evidence that would attenuate the taint of the initial entry. Consequently, the discovery of all evidence in plain view inside the camper, as well as evidence obtained from Little's consent to search the camper and his ensuing incriminating statements, were "the product of and tainted by the illegality" of the initial entry. See *Corey*, supra, 320 Ga. App. at 357 (1) (c); *Watson*, supra, 302 Ga. App. at 623-624 (1); *Rogers*, supra, 206 Ga. App. at 660-661 (4).

Accordingly, we reverse the trial court's order denying Little's motion to suppress and reverse Little's convictions. See *Miranda*, 189 Ga. App. at 221 (3).

*Judgment reversed. Division Per Curiam. All Judges concur.*