## S12A1698. RASHID v. THE STATE.
### (737 SE2d 692)

HINES, Justice.
Chaudhry Rashid appeals his conviction for malice murder in connection with the strangulation death of his daughter, Sandeela Kanwal. Rashid challenges the sufficiency of the evidence of his guilt, grants of immunity to members of his family, the admission into

evidence of a videotaped conversation between himself and his family, the use of a transcript of the videotape, and aspects of the trial court's instructions to the jury. Finding the challenges to be without merit, we affirm.[1]

Rashid immigrated to the United States from Pakistan following the death of his wife. After he remarried, his four children, including Kanwal, emigrated from Pakistan and began living with him. Upon the insistence of Rashid, in 2005 Kanwal married her first cousin in order to permit the cousin entry into the United States. The cousin arrived in Georgia in 2008, stayed briefly with Rashid and his family, and then moved to Chicago without Kanwal. Kanwal contacted an attorney to seek a divorce. When Kanwal's family learned of her intention to divorce her cousin, the family "started to force her not to do anything, not to leave the house, not to go and work. Trying to cut her off from everything." Kanwal and Rashid argued frequently. Kanwal asked a friend to "try and get her out of the house" and to take her to a physician so that she could attempt to convince her father that she was not having any affairs and that she was not pregnant. In a telephone call to the friend, Kanwal confided that Rashid had found out that she filed for divorce, and that she feared her family would "take measures against her," including poisoning her food.

On July 6, 2008, Clayton County police responded to a 911 call at Rashid's residence. One of Kanwal's brothers told the responding officer that he thought Kanwal was dead inside the house because Rashid told him so. The officer found Rashid sitting on the ground behind a vehicle in the driveway, and asked him what had happened. Rashid responded that his daughter was dead, and when the officer inquired how she died, Rashid "dropped his head down between his legs." The officer entered the home, which had an acrid smell like that given off from an electrical or plastic burn, and discovered Kanwal's body in an upstairs bedroom; there were darkened marks around her neck. Remnants of a burned cord were found in the garage. At the scene, Rashid appeared to suffer a medical emergency and was taken

---

[1] The murder occurred on July 6, 2008. On November 12, 2008, a Clayton County grand jury returned an indictment against Rashid charging him with the malice murder of Kanwal by ligature strangulation, the felony murder of Kanwal while in the commission of aggravated assault by ligature strangulation, and aggravated assault with the intent to murder. He was tried before a jury May 2-6, 2011, and was found guilty of all charges. On May 6, 2011, Rashid was sentenced for malice murder to life in prison with the possibility of parole; the felony murder verdict stood vacated by operation of law, and the aggravated assault was found to merge with the malice murder for the purpose of sentencing. A motion for new trial was filed on May 26, 2011, and the motion was denied on February 17, 2012. A notice of appeal was filed on March 9, 2012, and the case was docketed in this Court in the September 2012 term. The appeal was argued orally on October 1, 2012.

to a hospital. Following his release from the hospital, Rashid was transported to the police department where detectives conducted a videotaped interview of him with the aid of an interpreter fluent in Urdu and Punjabi. Rashid's statements during the interrogation were ultimately suppressed based upon the trial court's finding of a *Miranda*[2] violation.[3]

At the conclusion of the police questioning, Rashid asked to speak with his family. The recording equipment in the interview room was still on when Rashid met with family members. Rashid, speaking in Urdu and Punjabi, repeatedly admitted to killing his daughter because she was defying him by pursuing a divorce, stating, inter alia, "I could not tolerate it, that my daughter confronted me in this way." Describing the act of the murder itself, he said, "There was no noise; those who want to get things done, do it silently." He further explained, that had his daughter survived his attack, "she was so filthy, she would have put me in jail." Multiple times he expressed his belief that he had done the right thing by killing his daughter because she was bringing dishonor to herself, to him, and to the entire family.

The State filed a motion to admit Rashid's recorded statements during his conversation with his family, and the trial court granted the State's motion. At trial, the court allowed the State to show the videotape, publish a transcript of the recording to the jury, and use a Federal Bureau of Investigation ("FBI") linguist to translate the recording.

Prior to trial, Rashid's wife and sons invoked their Fifth Amendment rights. During trial, the State moved to offer grants of immunity

---

[2] See *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

[3] Following a pre-trial hearing pursuant to *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964), the trial court excluded Rashid's statements to police based upon Rashid's invocation of his right to counsel.

During the interview, Rashid acknowledged, in English, that he understood English "a little bit." Prior to questioning, Rashid was given his *Miranda* rights. After being informed that he had the right to have an attorney and one that was appointed for him if he could not afford to hire counsel, Rashid initially responded "Yes I do need a government lawyer. I do not have money." However, he then stated that he was uncertain as to whether he should have a lawyer "right now," and that he "would want a lawyer in the court." After being asked for clarification, Rashid responded that he would "talk right now," and would "talk with a lawyer or without a lawyer." He was asked whether he clearly understood his legal rights as told to him, and he answered, "Yes, fully." Rashid was then asked, "And you are ready to talk with us right now and you do not need a lawyer. Is that correct?" Rashid responded, "Yes it is absolutely correct." Initially, Rashid related that he did not know what happened to his daughter but merely found her lifeless body on the floor of her bedroom. However, later in the interview he admitted killing his daughter, stating that he did so because she wanted a divorce and was romantically involved with another man; he also stated that in Pakistan, his daughter would have been subject to death by stoning for what he perceived as her misdeeds.

from prosecution to Rashid's three sons. Pursuant to former OCGA § 24-9-28,[4] the trial court granted Rashid's sons use and derivative use immunity and required them to testify. All three sons testified that they did not kill Kanwal. Further, two of Rashid's sons testified that they were not at home when Kanwal was killed.

1. Contrary to Rashid's contention, the evidence was sufficient to authorize a rational trier of fact to find him guilty beyond a reasonable doubt of the malice murder of his daughter. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The trial court granted use and derivative use immunity to Rashid's sons following opening statements and some testimony from State's witnesses. Rashid contends that it was error to grant the immunity during what he characterizes as the "middle of the trial," claiming that the timing undermined his entire trial strategy, including that for voir dire and jury selection, and therefore, resulted in prejudice to him. He claims further error in the trial court's limiting the immunity granted to that of "use and derivative use," arguing that the limited immunity subjected the sons to possible charges of perjury if their trial testimony deviated from their earlier statements even if the prior statements contained falsehoods.

Although it is plain that Rashid would have preferred the trial court not order his sons to testify, in general he has no standing under

---

[4] OCGA § 24-9-28 provided:

(a) Whenever in the judgment of the Attorney General or any district attorney the testimony of any person or the production of evidence of any kind by any person in any criminal proceeding before a court or grand jury is necessary to the public interest, the Attorney General or the district attorney may request the superior court in writing to order that person to testify or produce the evidence. Upon order of the court that person shall not be excused on the basis of his privilege against self-incrimination from testifying or producing any evidence required; but no testimony or other evidence required under the order or any information directly or indirectly derived from such testimony or evidence may be used against the person in any proceedings or prosecution for a crime or offense concerning which he testified or produced evidence under court order. However, he may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing, or contempt committed in testifying or failing to testify, or in producing or failing to produce evidence in accordance with the order but shall not be required to produce evidence that can be used in any other courts, including federal courts. Any order entered under this Code section shall be entered of record in the minutes of the court so as to afford a permanent record thereof; and any testimony given by a person pursuant to such order shall be transcribed and filed for permanent record in the office of the clerk of the court.

(b) If a person refuses to testify after being granted immunity from prosecution and after being ordered to testify as aforesaid, he may be adjudged in contempt and committed to the county jail until such time as he purges himself of contempt by testifying as ordered without regard to the expiration of the grand jury. If the grand jury before which he was ordered to testify has been dissolved, he may purge himself by testifying before the court.

Georgia law to challenge the offer and grant of immunity to his sons. *King v. State*, 273 Ga. 258, 264-265 (15) (539 SE2d 783) (2000). The sons' rights, rather than Rashid's rights, were at issue. Under OCGA § 24-9-28 (a), the trial court had to consider whether the State's request to offer immunity was "necessary to the public interest." Id. Further, assuming arguendo that Rashid does have standing to complain of any aspect of the grants of immunity, including the timing and breadth thereof, he has not shown any resulting prejudice. He does not detail or explain how his defense strategy would have differed if immunity had been granted earlier or if blanket immunity had been given. The record shows that Rashid knew or should have known that the grants of immunity were a possibility, if not a probability. In addition, the defense was well aware of the sons' prior statements to authorities, and therefore, was on notice of their possible trial testimony. What is more, there were some significant discrepancies between the earlier statements to authorities and the trial testimony demonstrating that the sons did not feel constrained for any reason to mimic their prior statements.

3. Rashid contends that the trial court erred in admitting into evidence the videotape of his conversation with family members in the police interrogation room because the recordings amounted to an illegal search and seizure in violation of the Federal and State Constitutions because he had a reasonable subjective and objective expectation of privacy while making such statements. But, the contention is unavailing.

To establish a Fourth Amendment violation, a defendant must demonstrate both a "subjective" expectation of privacy and that the expectation is one that society is willing to recognize as reasonable. *Burgeson v. State*, 267 Ga. 102, 107 (3) (d) (475 SE2d 580) (1996). First, Rashid presents no Georgia law supporting his claim that a defendant may have a reasonable expectation of privacy in a police interview room. Rashid claims that the only factually similar Georgia cases on this issue failed to reach the second prong, namely the reasonableness of the defendant's expectation. This assertion is simply incorrect. In *Burgeson*, this Court found no error for the trial court's refusal to suppress the defendant's incriminating statements made in the back of a police patrol car. This Court affirmed that, "[f]or the purpose of a privacy analysis, a police car is much like a jail cell, that is, no reasonable expectation of privacy exists." Id. at 106-107 (3) (d). Rashid erroneously suggests that the "intimate . . . substance" of the family conversation denotes the reasonableness of Rashid's expectation of privacy. However, this confuses the demonstration of a subjective expectation of privacy and the reasonableness thereof.

While the subject matter of the defendant's statements might evidence a subjective expectation of privacy, the location in which the incriminating statements were made, and other circumstances surrounding the conversation determine the reasonableness of that expectation. See *Preston v. State*, 282 Ga. 210, 214 (4) (647 SE2d 260) (2007). There is no evidence that the police did anything to foster a belief that Rashid's conversation with his family would be private. In fact, Rashid requested the family meeting without any prompt from law enforcement. Furthermore, Rashid had admitted committing the murder to police and plainly knew that what he had done was against American law and that he was subject to punishment for his crime. In fact, he was handcuffed in the interview room throughout the conversation with his family, further evidencing the reality of his custody and the unreasonableness of any expectation of privacy.

4. Rashid also argues that the recording of the family conversation was inadmissible as "fruit" of the earlier interrogation, which subsequently was found to be unlawful. But, the argument fails.

In considering the admissibility of evidence that is alleged to be "fruit of the poisonous tree," the question is whether the evidence " 'has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Teal v. State*, 282 Ga. 319, 323 (2) (647 SE2d 15) (2007), citing *Wong Sun v. United States*, 371 U. S. 471 (83 SC 407, 9 LE2d 441) (1963). The "fruit of the poisonous tree" doctrine fails where intervening circumstances attenuate the link between the illegality and the evidence obtained. See *Dunaway v. New York*, 442 U. S. 200, 218 (99 SC 2248, 60 LE2d 824) (1979). First, Rashid's personal request to visit with his family amounts to an intervening cause. Second, the asserted illegality was a *Miranda* violation, for which the trial court excluded Rashid's statements as the result of the police questioning. *Miranda* warnings are required only in custodial interrogations, not familial conversations; Rashid's conversation with family members occurred while he was in custody, but they were not the product of interrogation. *Preston*, supra at 213 (4). Nor was the purely family conversation tainted in any way by the prior interrogation merely because following the family meeting, police re-entered the interview room and asked Rashid for some contact information concerning his brother and the victim's husband. Simply, the subject conversation between Rashid and his family did not flow from the found illegality. What is more, there is no evidence that Rashid's statements to police or to his family were coerced in any manner and the "fruit" of a voluntary statement obtained in violation of *Miranda* and *Edwards*

*v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981), is not subject to the exclusionary rule. *Taylor v. State*, 274 Ga. 269, 276 (4) (553 SE2d 598) (2001).

5. Rashid next urges that the trial court erred by permitting the jury to use the transcript of the family meeting during the interpreter's testimony regarding the videotape and by allowing the interpreter to read the transcript into the record rather than translate the video being played. He argues that the jury's use of the transcript was not necessary and highly prejudiced him because it constituted "continuing and cumulative evidence," and that the transcript was "too far removed from the original statements themselves." He further complains that the interpreter reading from the transcript violated OCGA § 24-9-69[5] which prescribed the proper method for a witness to "refresh their recollection."

The record reveals that the trial court instructed the jury to use the transcript "only as an aid to assist you while the DVD or the video recording is being played," and that the recording itself, not the transcript, was evidence. Under the circumstances of this cautionary instruction by the trial court and the absence of evidence of substantive inaccuracies in the transcript, it was not an abuse of the trial court's discretion to permit the jury the limited use of the transcript. See *Stinski v. State*, 286 Ga. 839, 850 (40) (691 SE2d 854) (2010).

As for the use of the transcript at trial by the FBI contract linguist who translated the videotape, here again Rashid fails to demonstrate error or an abuse of the trial court's discretion in permitting the translator to refer to the transcript. The videotape contained information that had been redacted from the transcripts used by the translator and the jury; therefore, if the translator interpreted the Punjabi and/or Urdu dialogue solely from the videotape as it was spoken without referring to the transcript, then parts of the dialogue that had been redacted as inadmissible would have been improperly put before the jury. Finally, Rashid does not show how he was prejudiced in any manner by the uses of the transcript.

6. Rashid contends that the trial court "erred and created highly prejudicial error" when it denied his request to charge the jury on assisted suicide. But, that is far from the case.

---

[5] Former OCGA § 24-9-69, which has been replaced by OCGA § 24-6-612, provided:
A witness may refresh and assist his memory by the use of any written instrument or memorandum, provided he shall finally speak from his recollection thus refreshed or shall be willing to swear positively from the paper.

Assuming arguendo that the act of assisting suicide was a viable legal defense at the time of Rashid's trial,[6] a jury instruction on it was not warranted. Denial of a requested charge to the jury is proper if the charge is not legal, apt, precisely adjusted to some principle involved in the case, and authorized by the evidence. *Stokes v. State*, 281 Ga.

---

[6] Former OCGA § 16-5-5 (b) was in effect at the time of trial. In *Final Exit Network, Inc. v. State of Ga.*, 290 Ga. 508 (722 SE2d 722) (2012), this Court struck down the statutory provision as violative of the free speech clauses of the Federal and State Constitutions. Thereafter, the General Assembly enacted a new OCGA § 16-5-5, effective May 1, 2012, which directly criminalizes assisted suicide. It provides:

(a) As used in this Code section, the term:

(1) "Assists" means the act of physically helping or physically providing the means.

(2) "Health care provider" means any person licensed, certified, or registered under Chapter 9, 10A, 11, 11A, 26, 28, 30, 33, 34, 35, 39, or 44 of Title 43.

(3) "Suicide" means the intentional and willful termination of one's own life.

(b) Any person with actual knowledge that a person intends to commit suicide who knowingly and willfully assists such person in the commission of such person's suicide shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than one nor more than ten years.

(c) The provisions of this Code section shall not apply to:

(1) Pursuant to a patient's consent, any person prescribing, dispensing, or administering medications or medical procedures when such actions are calculated or intended to relieve or prevent such patient's pain or discomfort but are not calculated or intended to cause such patient's death, even if the medication or medical procedure may have the effect of hastening or increasing the risk of death;

(2) Pursuant to a patient's consent, any person discontinuing, withholding, or withdrawing medications, medical procedures, nourishment, or hydration;

(3) Any person prescribing, dispensing, or administering medications or medical procedures pursuant to, without limitation, a living will, a durable power of attorney for health care, an advance directive for health care, or a consent pursuant to Code Section 29-4-18 or 31-9-2 when such actions are calculated or intended to relieve or prevent a patient's pain or discomfort but are not calculated or intended to cause such patient's death, even if the medication or medical procedure may have the effect of hastening or increasing the risk of death;

(4) Any person discontinuing, withholding, or withdrawing medications, medical procedures, nourishment, or hydration pursuant to, without limitation, a living will, a durable power of attorney for health care, an advance directive for health care, a consent pursuant to Code Section 29-4-18 or 31-9-2, or a written order not to resuscitate; or

(5) Any person advocating on behalf of a patient in accordance with this subsection.

(d) Within ten days of a conviction, a health care provider who is convicted of violating this Code section shall notify in writing the applicable licensing board for his or her licensure, certification, registration, or other authorization to conduct such health care provider's occupation. Upon being notified and notwithstanding any law, rule, or regulation to the contrary, the appropriate licensing board shall revoke the license, certification, registration, or other authorization to conduct such health care provider's occupation.

875, 877 (3) (644 SE2d 116) (2007). Despite Rashid's claim to his family that during the fatal encounter the victim stated, "kill me, kill me," the record is devoid of evidence that the victim took her own life. In fact, the evidence compellingly points to the contrary conclusion that the victim was in no manner suicidal, but rather feared for her safety and her very life, and was focused on survival. Further, the medical evidence presented at trial is undisputed that the victim died as the result of strangulation, and there is no evidence whatsoever that the victim strangled herself, with or without Rashid's assistance; therefore, he did not assist her in the act which brought about her demise.

7. Finally, Rashid asserts that the trial court erred by charging the jury on the law of admissions rather than that of confessions. However, this assertion of error fails as well.

Rashid's argument is premised upon OCGA § 24-3-53,[7] which stated, "All admissions shall be scanned with care, and confessions of guilt shall be received with great caution. A confession alone, uncorroborated by any other evidence, shall not justify a conviction." He urges that his statements in the videotaped family conversation amounted to a confession rather than admissions, which thus had to be corroborated, and failure to so charge the jury was "especially harmful." Even assuming arguendo that Rashid's statements to his family amounted to a confession requiring corroboration, Rashid can demonstrate no harm as there was ample corroborating evidence at trial, including but not limited to, Rashid's own behavior at the crime scene, witness testimony about personal observations and the victim's statements regarding her fear of Rashid, and the forensic evidence before the jury.

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 22, 2013 —
RECONSIDERATION DENIED FEBRUARY 18, 2013.

*Begner & Begner, Alan I. Begner, Cory G. Begner, Boris Y. Milter,* for appellant.

*Tracy Graham-Lawson, District Attorney, Elizabeth A. Baker, Jason B. Green, Kathryn L. Powers, Assistant District Attorneys,*

---

[7] Former OCGA § 24-3-53 is now OCGA § 24-8-823.

*Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Benjamin H. Pierman, Assistant Attorney General,* for appellee.