**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 20, 2014**

# In the Court of Appeals of Georgia

A14A1402. MADISON v. THE STATE.

BOGGS, Judge.

Lawrence Madison appeals from his convictions for child molestation, two counts of sexual battery, and aggravated sexual battery.[1] He asserts the general grounds and that numerous errors below entitle him to a new trial. For the reasons explained below, we affirm Madison's child molestation conviction. But, based upon an error in the trial court's charge to the jury, we reverse his sexual battery and aggravated sexual battery convictions.

In reviewing the sufficiency of the evidence,

---

[1] This is Madison's second appeal to this court. In *State v. Madison*, 311 Ga. App. 31 (714 SE2d 714) (2011), this court affirmed the trial court's grant of a motion to suppress.

the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

(Citations and footnote omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

So viewed, the record shows that Madison's child molestation conviction arose out of his conduct in October 2006 when the victim, Madison's adopted step-daughter, was 15 years old. His sexual battery and aggravated sexual battery convictions relate to his actions in October of 2009, when the victim was 18 years old. Evidence of the victim's allegation that Madison molested her in 2003 was admitted during the trial, but Madison was not charged with a crime for this alleged conduct.

*2003 Incident*

The State submitted evidence showing that in 2003, when the victim was eleven years old, she reported to an after-school care provider that her stepfather was touching her inappropriately. The provider informed the victim's mother as well as the police about the victim's allegation. The victim testified that in 2003, Madison would give her a back massage and then "he moved to the front" and touched her breasts. She explained that "[w]hen it would happen I kinda froze and I just didn't . . . I knew that it was happening but I didn't really pay attention to it, I guess. Like I would always focus on something else to keep my mind . . . away from what was happening basically." She explained that she later denied that Madison did anything inappropriate in the ensuing investigation, because Madison and her mother attacked her, told her "not to tell the whole truth," she "didn't want him to get in trouble," and did not want to be taken away from her family. She stated that she had been taken to a runaway shelter and she "she did not want to stay there anymore and [she] just wanted out of the whole situation."

The victim's mother testified that the victim told her in 2003 that she was uncomfortable with Madison touching her shoulders and nothing more. She denied coaching the victim, and explained that there was an agreement in the family after this report "for him not to touch her shoulders." A police investigator testified that after

3

her investigation, including an interview with the victim in which she denied that her father touched her breasts, a decision was made "that there wasn't really criminal conduct involved."

*2003-2006 Conduct*

The victim testified that after she returned home in 2003, Madison once again started hovering over her, rubbing her feet, brushing her hair, and watching her while she slept in the middle of the night. When she yelled for her mother in the middle of the night, her mother would come running and Madison would make an excuse for being in her room claiming, for example, that he was looking for something. The victim testified that after she made these reports, she would go stay with her grandmother for a few weeks or a month before returning home. Between 2003 and 2006, she stayed with her grandmother approximately six times. The victim's mother denied that the victim ever told her during this time period that Madison was making her uncomfortable or going into her room.

*2006 Incident*

With regard to the 2006 incident, the victim testified that she asked Madison for a back massage, because she had been in a car accident. She was watching a movie and her mom was in the kitchen doing dishes. She testified that she was lying

4

on the couch on her stomach and "he just walked over and sat on my butt and massaged me" and "as he's massaging me he's like grinding against me and, of course, I feel his boner just on my back, you know, just chillin'." She explained that when Madison "first got on me it was completely soft and then as soon as he started rubbing me it was hard." After the victim reported it to her school counselor, her

> mom an[d] grandma came up to the school and we were all yelling at each other in the counselor's office. They were calling me a liar again. My mom threatened to take my phone away from me because of everything. And I'd been offered a place to stay at [a friend]'s house . . . and my house said no, she can go to foster care instead. So she basically sent me to foster care. . . ."

After a period of time in foster care, the victim lived with her grandmother and "basically was forced to put on a happy face."

The victim's mother testified that both she and the victim's brother had been in the room at the time of the alleged incident and "had not seen anything" inappropriate. She explained that after the victim's first report to DFACS, she never left the victim alone with Madison. If she left the room to go the bathroom, she would make sure her son remained in the room with the victim. Because the mother was unwilling to go through another case plan with DFACS when she had been in the

5

room when it allegedly happened, she made arrangements for the victim to live with her grandmother through the age of eighteen.

During cross-examination of a police officer, the defense established that the grand jury returned a "no bill" concluding that insufficient evidence existed to charge Madison with a crime in connection with the 2006 incident.

*2009 Incidents*

In 2009, the victim graduated from high school and was still living with her grandmother while attending college. Madison offered for her to work part-time at his office to earn extra money in addition to her job at a restaurant. When cross-examined about why she "would even go near him," the victim explained,

> Because I was kinda forced to put on a . . . a smile about this whole thing. I was . . . I was forced to be nice to him. He offered to give me a job. What . . . eighteen year old isn't gonna . . . is gonna turn away a job where you get pretty much free money for bein[g] on Facebook . . . I didn't have to do crap over at his office. . . . It was very easy money and I needed extra money because I was going on trips. I was 'sposed to be going to . . . I had just come back from Costa Rica, I was gon' be going on a bunch of other stuff. It . . . I needed money. I wanted it.

She noticed after she started working in Madison's office that his pattern with her was forming again. He "was paying more attention to me, he was coming up

behind me a lot, putting his hands on my shoulders. Not really rubbing them but just putting them on my shoulders." She "didn't really think anything of it," until

> one day he just . . . he came up behind me and was massaging me and then he played with my nipples and then he actually started masturbating behind me. And honestly I don't really remember a lot of what happened after that because I was too shocked because it hadn't happened in three years that it was happening again and he actually did that behind me 'cause he had never done that before.

The victim told a couple of friends what had happened and testified that she "didn't know what to do."

She testified that she decided to return to work the following day,[2] and Madison engaged in nearly identical behavior as the day before. When she reported to work again the following Monday,

> he did the same thing as the first two days, he started off just giving me a back massage and unsnapped my bra. Rubbed my shoulders, rubbed my back, rubbed my breasts, played with my nipples. Dropped his drawers, masturbated behind me and . . . he was fondling my breast and then he went and started fingering me, playing with my vagina. And

---

[2] At one point in her testimony, the victim explained that she "went back for a reason and I'm not allowed to discuss that at all." The trial court granted a motion in limine before trial precluding any State's witness from referencing two video recordings of the victim's interactions with Madison in his law office.

definitely didn't know what to do because that had never happened before so it was very awkward to say the least and very uncomfortable.

And the whole time I remember I was just staring at the computer screen just because, like I said, I was completely shocked. It's like I couldn't move no matter if I wanted to or not. And at one point I remember the only time I've ever been able to say no to something that has ever happened, he tried to lift me up onto his lap and I pushed, . . . I pushed as hard as I could down into my seat so he couldn't lift me and he didn't. And he was like, you don't wanna sit in my lap and I said. . . . I shook my head no and he didn't try it anymore.

She explained that this was "the first time I had ever been able to say no because I knew that if I sat on his lap he would probably rape me, honestly."

She also testified that each of these three incidents lasted about an hour. . . and that in each they would have "a normal conversation" where

he asked if I was okay with him. Like he didn't feel like he was competent enough for me or something. I don't really . . . know how to explain it . . . he was basically . . . tellin' me like I know I'm old but you're really beautiful and stuff like that. And I kinda felt sorry for him, I guess, so I was like it's okay. Like . . . I didn't know how to respond to it.

She also agreed that she did not feel like she could tell him no. She admitted that never told him "no," because

> I didn't know how to say no, either. This has been going on since I was eleven and I have never known how. I've always frozen. . . . like a zombie. . . . [W]hen you're in that situation you completely freeze. You don't know what's going on. It's a complete shock value. It's almost like you get into a car accident. You don't know how to react at all. And I've never been able to react the way I've wanted to. When that was going on I've wanted to. . . . I was screaming in my head. I wanted to punch him in the face, I wanted to do all these things but I couldn't. It was out of fear that I couldn't do it.

After thinking about it and talking with friends, the victim decided to make a report to the police and did so seven days later, after she got her "evidence together and to make sure that I was actually gonna go through with it." After she told Madison, her mother, and grandmother about notifying the police, she moved in with a friend.

The victim testified that at the time of the 2009 incidents, she "was still very dependent on them. I had just graduated from high school and I was a freshman in college and I was living with my grandma so I wasn't like paying rent or anything. I don't think I ever paid my phone bill. I never really had to pay for anything, they

9

kinda paid for everything for me." She denied an allegation that she was blackmailing the defendant for $10,000, stating "I have never once asked for any amount of money for this. It's been going on since I was eleven, why would I be in this since eleven to get an amount of money."

During an interview with a police detective, he suggested that she record conversations with Madison and her mother. In the end of October or early November, she recorded a telephone call with both her mother and her father.

In a telephone call with her father, the victim began by telling him that she wanted to "try to resolve everything so that we can both move on, And I wanna know what you have to say." After the victim explained that she felt that she had suffered because she had not received any counseling, Madison stated:

> Alright, I . . . I don't really have a . . . a problem with counseling. I probably did when you were, you know, under a certain age because here's the legal ramifications, and I know the problem is - - attorney. But - - counselors and stuff when you're underage, then all that really is for them is an admission and they can use stuff against you, okay."

In another portion of a recorded telephone conversation, Madison stated: "Hold on, I've already talked to your mom about this - - your mom, she knows. She's asked me. She talks to you and then she talks to me, then she talks to you, then she talks to me.

10

And it's . . . it's, you know, it's not that I didn't - - I haven't told anybody that I've talked to that it didn't happen." Through the course of several other recorded telephone conversations, Madison repeatedly expressed concern about whether the victim had placed him on speaker or was recording their conversation, refused to discuss events before she turned eighteen, and expressed his view that she consented after the age of eighteen. At one point, the victim replied,

> I know that, but the first time you only asked me like twice. And then the second time you only asked me a little bit more. And then the third time you probably asked me like two or three times also. . . . I mean I understand that it . . . it gave you mixed signals but I guess I don't understand why it doesn't click in your mind that hey, this is my daughter.

The victim's mother testified that when she confronted Madison about the 2009 incidents, "[h]e never denied it, he said he made a mistake but she told him it was fine the whole way. That she never told him no. And he was deeply apologetic. He also didn't understand why she went [to the police] because a week before she had told him that she would go to the police if he didn't give her [$10,000]." According to the mother, the victim told her "that she was fine, that she never told him no." She also

11

testified that the victim "got upset" when Madison told her he could not provide her and her friends with an apartment.

A jailhouse informant testified that he befriended Madison when they were "locked up in segregation in Chatham County for like 'bout seven, eight months" in cells that were "right next door to each other." The informant testified that Madison told him that something had happened twice, but the informant did not know exactly when the first time occurred. Madison told him that his stepdaughter "used to walk around the house with her little shorts and stuff on and that his wife wasn't turning him on no more 'cause she was overweight or whatever and . . . and that, I guess, that he felt like she was encin' him or whatever."

The director of a child advocacy center testified about delayed disclosure and a child's accommodation of abuse. She also stated that

> When there is a close familial relationship it is much more likely the children will recant their abuse because there may be implicit pressure from family members. You know, mommy cries all the time, siblings are unhappy because their dad or big brother or grandpa's out of the home. . . . If the child was placed out of the home at Greenbriar and foster care with extended family it's much more likely the children will recant. They just want things to go back to the way they were.

1. Although Madison asserts that insufficient evidence supports all of his convictions, the argument section of his brief specifically addresses only the aggravated sexual battery convictions.

(a) Our review of the evidence reveals sufficient evidence to support Madison's child molestation conviction. See OCGA § 16-6-4 (a); *Wadley v. State*, 317 Ga. App. 333, 334-336 (1) (730 SE2d 536) (2012) (sufficient evidence of child molestation where defendant rubbed his penis against victim's buttocks).

(b) The evidence was also sufficient to sustain Madison's sexual battery convictions. Madison contends that the State failed to present sufficient evidence that he touched the victim without her consent. See OCGA § 16-6-22.1 ("A person commits the offense of sexual battery when he or she intentionally makes physical contact with the intimate parts of the body of another person without the consent of that person."); OCGA § 16-6-22.2 (A person commits the offense of aggravated sexual battery when he or she intentionally penetrates with a foreign object[3] the sexual organ or anus of another person without the consent of that person."). "[C]onsent induced by force or fear or intimidation does not amount to consent in

[3] "The term 'foreign object' includes not only inanimate instruments, but also a person's body parts such as a finger." (Citation and footnote omitted.) See *Hardeman v. State*, 247 Ga. App. 503, 504 (2) (544 SE2d 481) (2001).

13

law. . . ." (Punctuation omitted.) *Sears v. State*, 182 Ga. App. 480, 483 (4) (356 SE2d 72) (1987), overruled on other grounds by *Johnston v. State*, 213 Ga. App. 579 (445 SE2d 566) (1994). Based upon the victim's testimony that she could not tell Madison no "out of fear," a rational trier of fact could have concluded that Madison committed the acts of sexual battery "without the consent" of the victim. See *Clark v. State*, 249 Ga. App. 97, 98 (547 SE2d 734) (2001) (whether victim voluntarily submitted to intercourse issue of fact to be resolved by the jury);.

(c) We find no merit in Madison's contention that the State failed to present sufficient evidence of penetration to support his aggravated sexual battery conviction. "[P]enetration however slight will suffice to satisfy the statutory penetration element of O.C.G.A. § 16-6-22.2" and "penetration may be proved by indirect or circumstantial evidence." *Hendrix v. State*, 230 Ga. App. 604, 607 (4) (497 SE2d 236) (1997). The victim testified that Madison "started fingering me, playing with my vagina" and that at one point "he tried pushing the chair back like this to get my legs spread more so that he can put his fingers in me deeper, I guess you would say." This evidence is sufficient to support a finding of penetration by a rational trier of fact. Id.

2. Madison argues that the trial court erred by denying his motion for a mistrial in connection with a reference to the existence of video recordings of Madison's

14

conduct during the last two 2009 incidents in his office. According to Madison, this court held that it was improper to reference the video recordings, and harm resulted from the jury learning that "there was also a videotape that they had not seen."

Madison's contention that the Court of Appeals ruled that it was improper to reference the video is incorrect. The record shows that Madison filed two distinct motions in the trial court in connection with the videotapes: (1) on June 22, 2010, Madison moved to suppress the video recordings because they had been obtained in violation of OCGA § 16-11-62 (2); and (2) on October 26, 2011, Madison filed a motion in limine to prohibit the State and its witnesses "from making any direct or indirect reference whatsoever . . . regarding . . . suppressed video recordings." On September 30, 2010, the trial court granted only the motion to suppress the video recordings as it was the only motion pending at that time, the State filed a notice of appeal on October 7, 2010, and this court issued an opinion affirming the trial court's order on July 14, 2011. *Madison*, supra, 311 Ga. App. 31. The trial court granted Madison's motion in limine regarding the existence of the video recordings almost

five months later. Therefore, this court did *not* hold that it was improper for a State's witness to reference the videotapes.[4]

We find no merit in Madison's contention that a mistrial was warranted based upon a witness's testimony and the trial court's slip of the tongue during its curative instruction. The record shows that at one point in the jailhouse informant's testimony, he stated that Madison told him "he had f'ed up. That she had recorded him doin' --''The trial court immediately told the witness to "wait" and instructed the jury "to disregard that last statement of this witness." Defense counsel then asked for a bench conference in which he moved for a mistrial. After denying the motion for a mistrial, the trial court then gave the following curative instruction:

> Alright, Ladies and Gentleman, I think I mentioned to you during my opening charge to you that there may be occasion in which the Court might instruct you to disregard certain testimony or certain evidence. And if I do that, you are not to consider it whatsoever . . . Alright, regarding the last statement of this witness I'm going to ask you to disregard his statement entirely concerning any video. Is that clear? And not to consider it whatsoever.

---

[4] While Madison successfully sought to preclude any reference to the existence of the videotapes, we note that the victim's conduct in videotaping Madison might have been relevant and admissible on the issue of consent.

Defense counsel then renewed his motion for a mistrial because the trial court "made it clear that there's a video" in its curative instruction. The trial court denied the renewed motion.

We find no harm resulted from the witness's testimony or the trial court's slip of the tongue in its curative instruction. The jury was already aware that the victim had made audio recordings of her conversations with Madison, "[a]nd a mere verbal inaccuracy in a charge, which results from a palpable 'slip of the tongue,' [that] clearly could not have misled or confused the jury is not reversible error." (Citations and punctuation omitted.) *Williams v. State*, 267 Ga. 771, 773 (2) (a) (482 SE2d 288) (1997). See *Williams v. State*, 303 Ga. App. 222, 230-231 (6) (692 SE2d 820) (2010) (concluding no harm resulted from denial of mistrial based upon State's violation of trial court's evidentiary ruling).

3. We find no merit in Madison's claim that the trial court erred by refusing to sever his trial on the 2006 child molestation charge from the 2009 charges.

> [A] defendant has an absolute right to severance of charges that are joined solely because they are of the same or similar character. . . . [S]everance is not mandatory when offenses have been joined because evidence of one offense could be admitted upon the trial of another offense to show a common motive, plan, scheme, or bent of mind. In the latter circumstance, the decision whether to sever falls within the

17

discretion of the trial court, which should grant a pre-trial severance if it is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering whether in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

(Citation and punctuation omitted.) *Green v. State*, 279 Ga. 455, 456-457 (2) (614 SE2d 751) (2005).

Here, the evidence surrounding the 2006 charge, as well as the prior difficulty evidence dating back to 2003, were clearly admissible in any trial on the 2009 charges.

Proof of prior difficulties between the defendant and victim — including prior acts of molestation — is admissible without notice or a hearing. This evidence is admissible to show the defendant's motive, intent, and bent of mind in committing the act against the victim which resulted in the charges for which he was being prosecuted.

(Citation and punctuation omitted.) *Gant v. State*, 313 Ga. App. 329, 335 (2) (721 SE2d 913) (2011).[5] Additionally, where as here, "the offenses involve an ongoing scheme involving the same type of crime against the same victim," a motion to sever

---

[5] We note that the rules for admission of prior difficulty evidence under the new Evidence Code are codified at OCGA § 24-4-404 (b).

18

may be denied. *Bolton v. State*, 258 Ga. App. 581, 582-583 (1) (574 SE2d 659) (2002). Additionally, the evidence in this case was not complex, and there is no indication that the jury was unable to distinguish the evidence and apply the law intelligently to each offense. See generally *Dickerson v. State*, 304 Ga. App. 762, 764-765 (1) (697 SE2d 874) (2010). Finally, Madison's contention that he would have been able to admit additional evidence if the charges had been severed has no merit, because the trial court properly excluded it. See former OCGA § 24-2-3 (a) and (b) (rape shield law).

4. Madison asserts that the trial court erred by charging the jury that "[f]orce may be inferred as evidence of intimidation arising from familial relationships." He contends that the trial court should not have charged on force generally, because force is not an element of either child molestation or sexual battery and that no evidence of intimidation was presented at trial to support such a charge. Madison asserts that harmful error result from the last sentence in the following charge by the trial court:

> I further charge you, Ladies & Gentleman, a female under the age of sixteen years is legally incapable of giving consent. Force may be proven by direct or circumstantial evidence. Lack of resistance, induced by fear, is not legally cognizable consent, but is force. *Force may be inferred as evidence of intimidation arising from the familial relationship*. (Emphasis supplied.)

19

In a case in which a lack of consent by the victim is an element of the crime, a trial court may properly charge the jury that "consent induced by force, fear, or intimidation does not amount to consent in law. . . ." Superior Court Judges Suggested Pattern Jury Instructions, Vol. 2: Criminal Law (2014) § 2.30.14. See also *Curtis v. State*, 236 Ga. 362 (1) (223 SE2d 721) (1976); *Sears*, supra, 182 Ga. App. at 483 (4). Likewise, it also proper to charge: "Lack of resistance induced by fear is not consent but constitutes force." *Watts v. State*, 246 Ga. App. 367, 368-369 (2) (541 SE2d 41) (2000), reversed on other grounds, *Watts v. State*, 274 Ga. 373 (552 SE2d 823) (2001).

This court has explained that "[m]ental coercion, such as intimidation, shows force if the defendant's words or acts were sufficient to instill in the victim a reasonable apprehension of bodily harm, violence, or other dangerous consequences to herself or others." (Citation and punctuation omitted.) *Thomas v. State*, 306 Ga. App. 8, 9 (701 SE2d 525) (2010). Additionally, in the context of whether the State sufficiently proved force in a rape case, we have stated that "lack of resistance, induced by fear, is force, and may be shown by the victim's state of mind from her prior experience with the defendant and subjective apprehension of danger from

him." *Williams v. State*, 304 Ga. App. 592, 593 (1) (696 SE2d 512) (2010). See also *Davenport*, 316 Ga. App. 234, 237 (1) (b) (729 SE2d 442) (2012).

In the context of analyzing the sufficiency of the evidence in rape and sodomy cases, both of which require the State to establish force as separate element of the crime, this court has stated that "[f]orce may be inferred by evidence of intimidation arising from the familial relationship." *Shelton v. State*, 196 Ga. App. 163 (1) (395 SE2d 618) (1990). See also *Conley v. State*, Ga. App. at (1) (b) (Case No. A14A1237, decided September 22, 2014); *Davenport*, supra, 316 Ga. App. at 237 (1) (b); *Williams*, 304 Ga. App. at 593 (1) ; *Williams v. State*, 284 Ga. App. 255, 256-257 (1) (643 SE2d 749) (2007); *Schneider v. State*, 267 Ga. App. 508, 510 (1) (603 SE2d 663) (2004). In each of these cases, the victim was a minor,[6] and it is well-established that "the quantum of evidence to prove force against a child is minimal." (Citation and punctuation omitted.) *Haynes v. State*, 326 Ga. App. 336, 338 (1) (756 SE2d 599) (2014). See also *Brewer v. State*, 271 Ga. 605, 607 (523 SE2d 18) (1999) ("As with

---

[6] *Conley*, supra (victim 12 or 13 years old); *Davenport*, supra (victim minor when numerous incidents of rape occurred and it cannot be determined from opinion if rape conviction related to rape that occurred after victim turned 18); *Williams*, supra, (victim was a minor at all relevant times); *Williams*, supra, 284 Ga. App. at 255-256 (victim minor at all relevant times); *Schneider*, supra, 267 Ga. App. at 509 (victim 15 to 17 years old).

21

rape, only a minimal amount of evidence is necessary to prove that an act of sodomy against a child was forcible.") The State relied upon these cases to support its supplemental request to charge on "intimidation arising from the familial relationship,"[7] but none of them involve a jury charge, and our research has revealed no Georgia cases addressing the propriety of such a charge in any case, much less a sexual battery case in which force is not an element of the crime.

Based on the above, we doubt that a charge on force inferred by evidence of intimidation arising from the familial relationship is appropriate in a sexual battery case involving a victim who is over the age of 18. Moreover, the trial court's charge that "[f]orce may be inferred as evidence of intimidation arising from the familial relationship," in the absence of an accompanying charge explaining that "mental coercion, such as intimidation, shows force if the defendant's words or acts were sufficient to instill a reasonable apprehension of bodily harm, violence, or other dangerous consequences to herself or others," could have confused the jury and resulted in a finding of intimidation based upon the existence of the familial

---

[7] The State submitted this sole supplemental request during the middle of the trial and two days after it submitted the bulk of its requests to charge.

22

relationship alone.[8] Additionally, the State submitted no evidence showing "words or acts" on the part of Madison "sufficient to instill a reasonable apprehension of bodily harm, violence, or dangerous consequences to [the victim] or others."[9] The trial court therefore erred by including the last sentence of the State's requested charge, and we cannot conclude that this error was harmless as the issue of the victim's consent went to the heart of Madison's defense. We must therefore reverse his convictions for sexual battery and aggravated sexual battery.

5. We cannot consider Madison's assertion that he received ineffective assistance of counsel, because he asserted his right as an attorney to act as co-counsel with his retained attorney before and during his trial. See *Seagraves v. State*, 259 Ga. 36, 39 (376 SE2d 670) (1989). In *Mullins v. Lavoie*, 249 Ga. 411 (290 SE2d 472)

---

[8] The State's substitution of the word "as" for the word "by" may have compounded this confusion, because it makes the sentence harder to comprehend. We have previously stated, ""[f]orce may be inferred *by* evidence of intimidation arising from the familial relationship." (Emphasis supplied.) *Shelton*, supra, 196 Ga. App. at 163 (1). The State requested and the trial court charged, "Force may be inferred *as* evidence of intimidation arising from the familial relationship. (Emphasis supplied.)

[9] We note that fear *or* intimidation may be used to show a lack of consent. While the State failed to present evidence of intimidation, it did present evidence that the victim did not tell Madison no "out of fear." Thus, our conclusion that the State failed to present evidence of intimidation to support the charge does not render the evidence insufficient.

(1982), the Supreme Court of Georgia held "that when a criminal defendant elects to represent himself, either solely or in conjunction with representation or assistance by an attorney, he will not thereafter be heard to assert a claim of ineffective assistance of counsel with respect to any stage of the proceedings wherein he was counsel." Id. at 412-413. Accordingly, we cannot consider Madison's ineffective assistance of counsel claims. Id.; *Hooker*, supra, 278 Ga. App. at 387 (5) (b). Compare *Hance v. Kemp*, 258 Ga. 649, 650 (1) (373 SE2d 184) (1988) (considering ineffective assistance claims relating to performance of attorney before defendant sought to act as co-counsel).

6. In his remaining enumerations of error, Madison contends that the trial court erred by denying five of his requests to charge.

"A requested charge must be legal, apt, and precisely adjusted to some principle involved in the case and be authorized by the evidence. If any portion of the request to charge fails in these requirements, denial of the request is proper." (Citation and punctuation omitted.) *Grant v. State*, 295 Ga. 126, 131 (5) (b) (757 SE2d 831) (2014). "There is no error in refusing to give a requested charge where the applicable principles are fairly given to the jury in the general charge of the court."

24

(Citations and punctuation omitted.) *Riley v. State*, 268 Ga. 640, 643 (5) (491 SE2d 802) (1997). Additionally,

> where the state's evidence establishes all of the elements of an offense and *there is no evidence raising the lesser offense,* there is no error in failing to give a charge on the lesser offense. Where a case contains some evidence, no matter how slight, that shows that the defendant committed a lesser offense, then the court should charge the jury on that offense.

(Emphasis in original.) *Mobley v. State*, 279 Ga. App. 476, 479 (2) (631 SE2d 491) (2006).

(a) Madison asserts that the trial court erred by denying his request to charge on simple battery[10] as a lesser included offense of child molestation.[11] Specifically, he asserts that the jury could have concluded from the evidence that he did not touch her in a sexual manner in connection with the 2006 incident. We disagree. The

---

[10] "A person commits the offense of simple battery when he or she either: (1) Intentionally makes physical contact of an insulting or provoking nature with the person of another; or (2) Intentionally causes physical harm to another." OCGA § 16-5-23.

[11] "A person commits the offense of child molestation when such person . . . [d]oes any immoral act to or in the presence of or with any child under the age of 16 years of age with the intent to arouse or satisfy the sexual desires of either the child or the person." OCGA § 16-6-4 (a) (1).

evidence in this case offered the jury a choice between a completed crime or no crime. See *McGruder v. State*, 279 Ga. App. 851, 855 (2) (b) (632 SE2d 730) (2006); *Williams v. State*, 248 Ga. App. 316, 320 (4) (546 SE2d 74) (2001); *Ney v. State*, 227 Ga. App. 496, 502-503 (4) (g) (489 SE2d 509) (1997) (no error in failing to charge simple battery where evidence shows defendant fondled victim, not merely that he made physical contact of an insulting or provoking nature). Additionally, we note that it is not clear whether simple battery may ever be a lesser included offense of child molestation. See *McCord v. State*, 248 Ga. 765, 766 (285 SE2d 724) (1982); *Brooks v. State*, 197 Ga. App. 194 (1) (397 SE2d 622) (1990). If "two offenses have entirely different elements and require proof of totally different facts," one "is not included, as a matter of fact or law," in the other. *Chapman v. State*, 280 Ga. 560, 561 (4) (629 SE2d 220) (2006).

(b) Madison asserts that the trial court erred by failing to charge on simple battery as a lesser included offense of aggravated sexual battery.[12] We disagree, because the evidence with regard to the aggravated sexual battery gave the jury a

---

[12] "A person commits the offense of aggravated sexual battery when he or she intentionally penetrates with a foreign object the sexual organ or anus of another person without the consent of that person." OCGA § 16-6-22.2 (b).

choice between a completed crime or no crime. See *De'Mon v. State*, 262 Ga. App. 10, 16 (6) (584 SE2d 639) (2003).

(c) Madison cannot demonstrate error from the trial court's failure to give his request to charge on the age of consent, because the trial court gave a nearly identical charge that covered the same principle. See *Napier v. State*, 184 Ga. App. 770, 773 (5) (362 SE2d 501) (1987).

(d) Finally, the trial court did not err by failing to give Madison's Request to Charge 21, because it included material that was not adjusted to the evidence, specifically: "If you find that the alleged victim was not mentally capable of exercising judgment or of expressing intelligent consent or objection to the act of touching, then you would be authorized to find the defendant guilty." No evidence was presented at trial that the victim was mentally incapable of exercising judgment. "Denial of a requested charge to the jury is proper if the charge is not legal, apt, precisely adjusted to some principle involved in the case, and authorized by the evidence." *Rashid v. State*, 292 Ga. 414, 421 (6) (737 SE2d 692) (2013).

For the above-stated reasons, we affirm Madison's child molestation conviction and reverse his sexual battery and aggravated sexual battery convictions.[13]

*Judgment affirmed in part, reversed in part. Barnes, P. J., and Branch, J., concur*.

---

[13] We note that "the Double Jeopardy Clause does not preclude the State from retrying a criminal defendant whose conviction is set aside due to trial error, such as the incorrect admission of evidence or improper instructions." (Citation and punctuation omitted.) *Green v. State*, 291 Ga. 287, 288 (1) (728 SE2d 668) (2012).